RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0113p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

          *v.*

SHIRLEY A. CUNNINGHAM, JR. (09-5987) and
WILLIAM J. GALLION (09-5998),
                    *Defendants-Appellants.*

Nos. 09-5987/5998

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
Nos. 07-00039-001; 07-00039-002—Danny C. Reeves, District Judge.

Argued: January 17, 2012

Decided and Filed: May 1, 2012

Before: BATCHELDER, Chief Judge; CLAY and GILMAN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** T. Clifton Harviel, HARVIEL LAW OFFICES, Memphis, Tennessee, H. Louis Sirkin, SIRKIN KINSLEY & NAZZARINE CO., LPA, Cincinnati, Ohio, for Appellants. Vijay Shanker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** T. Clifton Harviel, HARVIEL LAW OFFICES, Memphis, Tennessee, H. Louis Sirkin, Scott Ryan Nazzarine, SIRKIN KINSLEY & NAZZARINE CO., LPA, Cincinnati, Ohio, for Appellants. Vijay Shanker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, Laura K. Voorhees, E.J. Walbourn, ASSISTANT UNITED STATES ATTORNEYS, Ft. Mitchell, Kentucky, for Appellee.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  Shirley Cunningham, Jr., and William Gallion were two of three Kentucky lawyers who represented several hundred Kentucky clients in a mass-tort action against the manufacturer of the defective drug "fen-phen." They settled the case for $200 million, which entitled them under their retainer agreements to approximately $22 million each in attorney fees.  But rather than limit themselves to what they had contractually earned, Cunningham and Gallion concocted a fraudulent scheme to take from their clients almost twice that amount.  The scheme did not work out as planned:  Cunningham and Gallion were caught, subsequently disbarred from practicing law in Kentucky, and indicted on one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

After a mistrial, a superseding indictment was issued that again charged Cunningham and Gallion with one count of conspiracy to commit wire fraud, but added eight counts that specifically detailed the wire communications that were part of the scheme.  The two men were convicted on all counts at their second trial.  They have appealed and now attack their convictions on numerous grounds.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

**A.     Factual background**

In the 1990s, the diet drug popularly known as "fen-phen" (named for the combination of fenfluramine and phentermine) was used by an estimated six million Americans.  Fen-phen was initially hailed as a miracle drug, yet turned out to be anything but when it was found to cause heart-valve dysfunctions in as many as a third of its users.  These dysfunctions soon produced injuries, which in turn produced litigation.

One lawsuit in particular marks the factual starting point for this appeal. In 1998, a group of injured fen-phen users in Kentucky, represented by Kentucky lawyers Shirley Cunningham, William Gallion, and Melbourne Mills, brought a prospective class action against American Home Products (AHP), the drug's manufacturer. Also named as defendants in the lawsuit were Rex Duff, a Kentucky doctor who had prescribed fen-phen to many of the injured plaintiffs, as well as the clinic that Duff owned and operated. The case was certified as a class action in May 1999, but no notice was given to potential class members.

While the lawsuit was pending in Kentucky state court, another case against AHP was proceeding as a federal multi-district class-action claim in Pennsylvania. The federal litigation eventually resulted in a nationwide class-action settlement in August 2000, which was approved by the Pennsylvania district court supervising the case. Under the terms of the settlement, which defined the class as all persons in the United States who had used fen-phen, the Kentucky plaintiffs would have received a share of the total settlement amount in exchange for releasing their claims against AHP. But on the advice of their lawyers, the Kentucky plaintiffs opted out of the nationwide settlement, preferring instead to take their chances in the state-court action. A total of approximately 431 clients represented by either Cunningham, Gallion, or Mills opted out.

As a tactical move, opting out made financial sense for both the clients and their attorneys. The clients believed (correctly, as it turned out) that they would receive a more generous recovery by pursuing their own action in state court. And if they received such a recovery, their attorneys stood to make huge amounts of money in fees because each attorney had entered into retainer agreements with his respective clients entitling him to roughly a third of each client's recovery.

Because the state-court action remained quite large and complex—involving hundreds of plaintiffs with injuries ranging widely in terms of scope and severity—the attorneys sought outside help. They brought in class-action specialist Stanley Chesley, an attorney based in Cincinnati, Ohio. Chesley's role was to help negotiate a settlement

with AHP. If he succeeded in reaching a settlement, the Kentucky attorneys and Chesley agreed that Chesley would receive a share—at first 27 percent, but later reduced to 21 percent—of the attorney fees owed to Cunningham, Gallion, and Mills under their respective retainer agreements.

Settlement mediation between the Kentucky plaintiffs and AHP took place in the spring of 2001. According to the trial testimony of Jack Vardaman, who served as counsel for AHP during the settlement-negotiation process, the purpose of the mediation (and thus the purpose of any settlement agreement reached as a result of the mediation) was to settle the claims of the 431 clients represented by Cunningham, Gallion, and Mills; it was not to settle the claims of anyone else who might otherwise have qualified as a member of the class. The 431 clients were nevertheless kept in the dark throughout the settlement-negotiation process. As one internal email that Gallion sent prior to the mediation reads: "We do not want to tell any clients that we are going to try to settle a bunch of cases for a lump sum and then divide up the money. That is only inviting trouble."

After two days of mediation, AHP and the claimants' attorneys struck a deal on May 1, 2001. The total amount of the settlement was $200 million. Relevant provisions of the agreement included the following:

- the $200 million would be distributed to and allocated by Cunningham, Gallion, and Mills;

- AHP had a right to terminate the settlement agreement as to all claimants unless 95 percent of the claimants accepted the agreement by September 1, 2001;

- any claimant who accepted the settlement agreement would have to sign a release, thereby losing his or her right to bring a future claim against AHP arising out of the use of fen-phen;

- Cunningham, Gallion, and Mills would move to decertify the state-court class action and dismiss the case with prejudice;

- AHP would not pay any of the $200 million unless most of the claimants with the worst injuries agreed to settle their cases;

- all settlement terms were confidential except for the purposes of receiving tax advice or complying with a court order, and any knowing breach of confidentiality would result in Cunningham, Gallion, and/or Mills paying $100,000 in damages to AHP; and

- in a side letter to the agreement, Cunningham, Gallion, and Mills agreed to indemnify AHP up to the amount of $7.5 million for any future claims brought against Duff or his clinics within one year of dismissal of the state-court action by individuals who were not included in the settlement agreement.

Cunningham, Gallion, and Mills each signed the agreement. Vardaman signed on behalf of AHP.

Having come to a tentative agreement, the lawyers notified Judge Joseph Bamberger, who presided over the state-court action. Judge Bamberger then entered an order decertifying the class, dismissing with prejudice the claims of the 431 settling claimants—notably, before any of those claimants had even been made aware of, much less agreed to, the settlement—and dismissing without prejudice the claims of any potential class members beyond the 431 claimants covered by the May 1, 2001 agreement. In the order, Judge Bamberger made clear that "[t]he parties did not have sufficient information concerning, and were not able to reach a settlement of, the claims of other class members." He therefore did not construe the settlement agreement as a class-action settlement, but rather as an aggregate settlement of the claims of 431 specific individuals.

The lawyers then had to determine how to allocate the money among the 431 clients (or 440 clients, as the final number indicated). To this end, Gallion directed his associate David Helmers to draft a formula that computed each client's fair share, taking into account the extent to which each had been injured. The resulting formula was based primarily on the matrix used to distribute the nationwide class-action settlement fund. Gallion then modified the numbers to increase the share that would go to the clients who had sustained the worst injuries. The result was a comprehensive spreadsheet that listed each client's approximate share of the total recovery.

Next came the matter of notifying the clients that a deal had been reached and securing their assent to the terms of the settlement. In Kentucky, an attorney's professional obligation to his clients in aggregate-settlement situations is governed by Rule 3.130(1.8)(g) of the Kentucky Supreme Court. That rule, with which Cunningham, Gallion, and Mills explicitly agreed to comply in the May 2001 settlement agreement, provides as follows:

> A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients . . . unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement.

Ky. Sup. Ct. R. 3.130(1.8)(g). According to the government's expert witness, Professor Howard M. Erichson, this rule imposed upon Cunningham, Gallion, and Mills the obligation to inform their clients of the total amount of the settlement, the number of individuals sharing in it, the method used to calculate each individual's share, and the 95-percent acceptance requirement.

But the evidence at trial revealed that they did none of this. Instead, according to the testimony of numerous clients, a representative of the lawyers went to each client individually, told him or her that a tentative settlement agreement had been reached as to that individual's claim (without mentioning that the claim had already been dismissed with prejudice by Judge Bamberger), devalued the amount of the individual's recovery as compared to the number listed on Gallion's spreadsheet, and instructed the client to sign a confidential release.

If a client complained about the recovery amount or refused to settle, the lawyers' representative would return at a later date with a larger offer, falsely explaining that the lawyers had successfully renegotiated the client's claims with AHP. Every client ultimately accepted his or her settlement offer.

After each client had accepted the offer, he or she was informed of the agreement's confidentiality provision. But the lawyers misrepresented to at least some

of their clients the effect of noncompliance with that provision, telling these clients that they could go to jail if they told anyone about the details of the settlement. In this way, the lawyers used the provision as both a sword and a shield, bullying their clients into keeping their mouths shut and protecting the lawyers' actions from discovery by others.

With the 95-percent acceptance requirement satisfied, AHP began depositing the settlement money into an escrow account that the lawyers had established for the purpose of distributing the settlement funds. All $200 million, plus an additional $450,000 for the settlement of new claims, was deposited by the end of 2001. Under their retainer agreements, the lawyers were due approximately one third of this amount; the clients were entitled to the rest.

The actual breakdown, however, worked out quite differently. According to bank records introduced at trial, the lawyers paid their clients—in checks marked "final settlement"—just a bit more than $45 million altogether, or less than 23 percent of the total settlement amount. The lawyers kept the remainder for themselves and associated counsel, transferring much of it from the escrow account to various other accounts, including out-of-state accounts, held by either Cunningham, Gallion, or Mills. And even though the lawyers had paid their clients far less than the amounts owed under the lawyers' own allocation spreadsheet, Gallion directed Helmers and other subordinates to calculate the attorney fees using the higher numbers set forth in the spreadsheet.

The lawyers' actions eventually attracted the attention of the Kentucky Bar Association (KBA). After receiving a complaint regarding how Mills had handled the settlement, the KBA launched a disciplinary investigation into the matter in January 2002. Linda Gosnell, the KBA's chief counsel, led the investigation. She soon determined that she needed to review the specifics of the settlement-payment process to ascertain how the money had been distributed to the clients. Gosnell therefore requested that subpoenas be issued for the lawyers' bank-account records. Cunningham, Gallion, and Mills were served with the subpoena applications, which noted that a hearing regarding the subpoenas was scheduled before the Kentucky Supreme Court on February

11, 2002. Mills was served with the application on January 30; the record does not reflect when the other two attorneys were served.

Gallion stopped by Mills's office on January 31 and ordered an employee there to destroy any documents relating to the way in which the individual clients' claims had been settled. Declining to do so, the employee moved many of the documents into a locked drawer inside her office for safekeeping.

On February 8, 2002—three days before the Kentucky Supreme Court's hearing regarding the subpoena applications—Cunningham and Gallion ordered the transfer of approximately $59 million from their personal bank accounts back into the escrow account. Cunningham specifically requested that the transfers be completed no later than February 11. The transfers in fact occurred on that date, the same day that the Kentucky Supreme Court approved the issuance of the subpoenas.

Meanwhile, Chesley, Cunningham, and Gallion met with Judge Bamberger on February 6, 2002 to further discuss the settlement, despite the fact that Judge Bamberger had already dismissed the case. The meeting occurred late in the workday, outside the presence of AHP or any of the lawyers' clients. Several important developments transpired during the meeting. First, Gallion requested that the court approve an allocation of 49 percent of the total settlement fund as attorney fees. In making this request, Gallion failed to mention that each lawyer had already received fees—calculated by using the total settlement amount as opposed to the (lower) actual amount distributed to the clients—or even that each had previously entered into lower-percentage retainer agreements with their respective clients. Nor did Gallion tell the judge that the lawyers were currently under investigation by the KBA for their handling of the settlement.

Second, Chesley discussed with Judge Bamberger the possibility of distributing some of the excess funds from the settlement into a *cy pres* trust account, from which the money could be used for charitable purposes. Chesley explained that this practice is fairly common in class-action settlements. But he did not discuss with the judge why establishing a charitable trust was appropriate in this case or in aggregate settlements more generally. Nor did he mention the amount of money involved. And finally,

Gallion asked Judge Bamberger to order a second distribution of the settlement funds to the clients.

Judge Bamberger approved the 49-percent fee award and a second distribution in an order drafted by the lawyers. The order, which the judge signed on February 15, 2002, but which was not entered until June 6 of the same year, provides in pertinent part that the court had:

- "retain[ed] jurisdiction over the settled action for purposes of resolving any post-settlement issues including the anticipated need for Court participation in allocation of excess [settlement] funds";

- approved of "the manner in which [the settlement] proceeds have been handled," "the attorney's fees and expenses paid to date as reasonable and necessary," and "fees and expenses as discussed" on the ground that the court had "been provided an accounting of the settlement proceeds to date including the . . . assessment and allocation of attorney's fees";

- approved of "the method of claims administration, and the reasonableness and fairness of payments made to individual claimants," on the ground that the court had "been advised of the manner in which the individual claims have been administered and the proceeds allocated to the individual class members"; and

- approved of "the handling and management of [excess] funds to date" on the grounds that the court had "been advised of the existence of additional funds following the resolution of individual claims" and had "discuss[ed]  with the principal plaintiffs' counsel regarding the proper method of handling those funds from this date forward."

The court further ordered "that the funds be disbursed and allocated according to the following schedule": "[f]ifty percent of remaining funds shall be distributed to the individual clients on a pro-rata basis" and "[t]he remaining fifty percent shall be held for the purposes of handling any indemnification of contingent liabilities until further order of the court." No mention is made in the order that the judge had awarded 49 percent of the total settlement as attorney fees.

Despite later testifying that he disagreed with many of the factual statements contained in the order, Judge Bamberger signed it anyway. His explanation for doing so is that he trusted the attorneys to provide him with a truthful and comprehensive order.

In the spring of 2002, Cunningham and Gallion directed that the second distribution of settlement funds be made to the clients. The clients were sent letters explaining that "[t]he Court is going to allow us to release some of these funds to plaintiffs as extra compensation for a second distribution," and so "we will be permitted to give you additional settlement monies over and above the full compensation you have already received." These "additional settlement monies" ended up being about half of each client's initial allocation.

The letters also mentioned the topic of the charitable trust:

> After July, 2002, we will meet with the Court again and review the amounts paid pursuant to the indemnity agreement. If there are some sums left over, we would like to donate the remainder to a charity and know you would join us in this worthy and admirable act. The Court has indicated that it also thinks a donation would be appropriate and the Court would approve this. The issue of a charitable donation is premature as we do not know whether there will be any sums remaining to do this, but we wanted to inform you of our thoughts. Although we believe you would concur, if you have a strong objection to the idea of a donation to a charity, please let us know.

The letters did not clarify what "some sums" meant. Many clients assumed that the number was quite small, likely in the hundreds of dollars. Some asked how much would be donated and were told that "it would be a very small amount." But Cunningham and Gallion actually intended to put $20 million into the charitable trust. Many clients testified that they would not have agreed to the donation had they been made aware that the actual amount was so large.

The final state-court hearing relating to the settlement process took place in late June 2002. Before that hearing was set to begin, Gallion informed Judge Bamberger that $20 million remained in the settlement account and that the attorneys were considering

placing the excess money in a charitable trust.  Judge Bamberger asked if the clients knew about the extra $20 million.  Gallion said that they did and that they were "thrilled."

During the hearing, Judge Bamberger agreed to place the excess settlement funds into a charitable trust, to be known as the Kentucky Fund for Healthy Living (the Fund, for short).  Judge Bamberger signed an order to this effect, although the order did not mention the amount of money that would be put into the Fund.  The order also authorized the payment of fees and expenses to the Fund's four directors, three of whom happened to be Cunningham, Gallion, and Mills.  They each received nearly $150,000 in fees over the two-year period between June 2003 and June 2005.  Judge Bamberger himself later became a fifth paid director of the Fund, drawing more than $50,000 in fees between July 2004 and April 2005.

One other matter was addressed during the June 2002 hearing:  Judge Bamberger agreed to release the $7.5 million that the lawyers had set aside to cover the possible indemnity to AHP as provided in the side letter to the settlement agreement.  The judge specifically designated that money as attorney fees, which Cunningham, Gallion, and Mills split among themselves.

Including these payments, the $200,450,000 in total settlement proceeds broke down as follows:  Cunningham received over $21 million; Gallion, nearly $31 million; Mills, almost $24 million; Chesley, more than $20 million; the Fund, $20 million. Several other lawyers divided up approximately $10.5 million.  And the clients?  Even with the second distribution, they received a total of approximately $73.5 million—somewhat less than 37 percent of the total value of the settlement.

While all this was going on, the KBA was conducting its disciplinary investigation.  But before the investigation was complete, Cunningham and Gallion voluntarily filed motions to withdraw from the KBA under permanent disbarment.  The motions, which were filed in September 2008, admitted that the lawyers had committed numerous ethical violations.  Each lawyer acknowledged that:

(1) he did not tell his clients in writing that he had made fee arrangements with other attorneys; (2) he did not advise his clients concerning the mediation of their case, or provide them an opportunity to be present at the mediation or present input as to the value of their specific case; (3) he did not advise his clients of the total settlement amount and did not comply with the requirements of [Rule] 3.130-1.8(g) [of the Kentucky Supreme Court]; (4) he did not advise his clients that he was seeking fees that were more than the contingent fees provided in his contingent fee contracts; (5) he did not comply with the requirements of [Rule] 3.130-1.15 [of the Kentucky Supreme Court] to 'hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property . . . in a separate account maintained in the state where the lawyer's office [i]s situated . . .'; (6) he did not disclose to the clients that he intended to request that the Judge consider placing approximately $20,000,000 of the settlement funds into the Kentucky Fund for Healthy Living, Inc., or obtain their consent to that distribution; (7) he participated as a paid director of the Fund without client consent; and, (8) he did not disclose to his clients that their individual settlement amounts were being determined by a settlement protocol developed and administered by their own lawyers, not by the Defendant.

The Kentucky Supreme Court granted the motions in October 2008 and permanently disbarred Cunningham and Gallion from practicing law in Kentucky. Whether Mills was likewise disbarred or made similar admissions to the KBA cannot be ascertained from the record.

**B.     Criminal proceedings**

Based on the above facts, a federal grand jury issued an indictment in June 2007, charging Cunningham, Gallion, and Mills with one count of conspiring to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349. After a jury trial a year later in the United States District Court for the Eastern District of Kentucky, Mills was found not guilty. But the jury could not reach a verdict as to Cunningham or Gallion. Over objection from the government, Cunningham sought to waive his constitutionally protected right to a unanimous verdict and instead "accept a verdict if nine jurors agreed." The district court rejected his waiver, declared a mistrial, and transferred the case to another judge in the Eastern District of Kentucky.

A superseding indictment was issued by a federal grand jury in September 2008, again charging Cunningham and Gallion with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349, plus an additional eight counts of wire fraud, in violation of 18 U.S.C. §§ 2 and 1343. The indictment also included a forfeiture count under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). After a second jury trial, which commenced in February 2009, Cunningham and Gallion were convicted on all counts.

The district court sentenced Cunningham to 240 months in prison and Gallion to 300 months in prison, both terms to be followed by three years of supervised release. In addition, the court ordered the defendants to pay more than $127 million in restitution to their clients. Both defendants have appealed. Their separate appeals have been consolidated by this court.

## II. ANALYSIS

The defendants raise numerous issues on appeal. They attack the sufficiency of the evidence, challenge the timeliness of the indictments, assert constitutional violations and other error stemming from the district court's determination that the state-court action was resolved as an aggregate settlement rather than as a class action, claim that several of the court's evidentiary rulings constituted an abuse of discretion, dispute the restitution amount, contend that the district court erred by not granting a mistrial due to the health problems of Gallion's counsel, and argue that Cunningham should have been allowed to waive his constitutional right to a unanimous verdict. We will address each of these issues in turn below.

## A.    Sufficiency of the evidence

### 1.    *Standard of review*

Gallion first challenges the sufficiency of the evidence supporting his convictions for wire fraud and conspiracy to commit wire fraud. We review de novo a district court's denial of a motion for acquittal based on the insufficiency of the evidence, *United States v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008), and must affirm the district court's

decision if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Because we may not independently weigh the evidence or "substitute our judgment for that of the jury," *Johnson v. Mitchell*, 585 F.3d 923, 931 (6th Cir. 2009), a defendant making an insufficiency-of-the-evidence argument "bears a very heavy burden." *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003) (internal quotation marks omitted).

### 2.        *Evidence of wire fraud*

The crime of wire fraud consists of three elements, each of which must be proven beyond a reasonable doubt:  (1) "that the defendant devised or willfully participated in a scheme to defraud"; (2) "that he used or caused to be used an interstate wire communication in furtherance of the scheme"; and (3) "that he intended to deprive a victim of money or property." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010) (internal quotation marks omitted).  Gallion attacks the evidence as to the first and second of these elements—the first by arguing that the evidence was insufficient to support the jury's conclusion that he had the requisite intent to defraud; the second by arguing that the evidence was insufficient to support the jury's conclusion that the wire transfers furthered the scheme to defraud (even assuming that there was such a scheme).

### a.        *Intent to defraud*

The first element covers the requisite mental state.  A defendant must have been part of "a scheme to defraud," meaning "any plan or course of action by which someone *intends* to deprive another . . . of money or property by means of false and fraudulent pretenses, representations, or promises." *Id.* (emphasis added) (internal quotation marks omitted).

Gallion's argument for why he lacked the intent to defraud is essentially that he and Cunningham had little experience handling complex litigation and simply "got in over our heads."  He thus attributes most of their unethical behavior—including setting up the charitable trust, seeking 49 percent of the settlement in attorney fees, and

misrepresenting numerous facts to Judge Bamberger—to the misguided advice of Chesley, upon whose expertise Gallion claims to have reasonably relied.  And he further attempts to immunize his conduct by pointing to the fact that Judge Bamberger signed off on many of the actions that constituted the alleged scheme to defraud.  As Gallion sees the situation, his "good faith reliance on Chesley's advice and guidance, as well as Judge Bamberger's approval of all significant aspects of the state court action, negated any alleged criminal intent."

But Gallion's interpretation of the evidence is just that: *his* interpretation.  Such a view is bolstered only if one draws all factual inferences in *his* favor.  Viewing the evidence as legally required—in the light most favorable to the government—there is little doubt that the evidence was sufficient to support the jury's conclusion that Gallion intended to defraud his clients out of money that was rightfully theirs.

Consider just some of the evidence produced at trial.  Testimony revealed that Cunningham and Gallion directed their subordinates to conceal highly important information about the settlement from their clients (including the total amount of the settlement, the number of claimants sharing in it, and the method of allocation) and to offer each claimant substantially less than his or her properly calculated share.  Moreover, according to the trial testimony, the lawyers misled some of their clients into believing that there had been a successful renegotiation of their claims with AHP and that a breach of the settlement's confidentiality clause could lead to jail time.  These misrepresentations support the conclusion that Cunningham and Gallion participated in a massive scheme to defraud their clients.

In addition, an employee of Mills testified that, one day after learning that the KBA had applied to subpoena the lawyers' bank-account records, Gallion ordered her to destroy all documents related to the manner in which the individual clients' claims had been settled.  And shortly before the Kentucky Supreme Court's hearing to decide whether to authorize the subpoenas, Cunningham and Gallion transferred approximately $59 million from their personal bank accounts back into the escrow account.  These actions clearly indicate that Cunningham and Gallion knew that what they had done was

wrong, and further support the conclusion that they had intended to defraud their clients out of millions of dollars.

As for Gallion's alternative theory of the evidence, two further points deserve mention here. The first is that the "evidence need not exclude every reasonable explanation except that of guilt" to sustain a conviction. *United States v. Gonzalez*, 512 F.3d 285, 294 (6th Cir. 2008). So even if Gallion's explanation for his actions was plausible, his convictions for wire fraud would still be supported by sufficient evidence.

Second, when viewed in the light most favorable to the government, the evidence severely undermines Gallion's explanation of the pertinent events. Gallion submits that he reasonably relied on Chesley's expertise throughout the settlement and post-settlement processes. But that does not explain why Gallion asked the judge to authorize attorney fees of 49 percent when Gallion had already taken lower retainer-based fees using his clients' calculated (but not actual) recovery amounts. Nor does it explain why he concealed important details of the settlement from his clients or misrepresented other information to them, including the amount of excess funds that would be deposited into the charitable trust.

Moreover, Gallion cannot justifiably rely on the "rubber stamp" orders signed by Judge Bamberger. The judge's own testimony indicates that he was consistently misled about the settlement's details. He was not told that Cunningham, Gallion, and Mills had already received attorney fees according to their retainer agreements—or that they even had retainer agreements—when he authorized the 49-percent figure; he was not informed that the lawyers were being investigated by the KBA for their handling of the case; and he was told that the clients were aware of and "thrilled" by the $20-million charitable contribution to establish the Fund. This testimony provides a powerful rebuttal to Gallion's professions of passivity and good-faith reliance on Judge Bamberger's orders.

Finally, Gallion contends that his actions immediately after learning of the KBA's investigation were in fact motivated by an unrelated occurrence: the Third Circuit Court of Appeals' approval of the nationwide class-action settlement, which

happened around the same time. He claims that the $59 million that he and Cunningham transferred back into the escrow account had been set aside to cover any liability that might arise as a consequence of the Kentucky settlement's indemnity provision. As he testified at trial, he feared that if the nationwide class action fell apart, he (along with Cunningham and Mills) could end up on the hook to AHP for tens of millions of dollars to indemnify it for claims brought by Kentucky plaintiffs who were part of the nationwide class action. The Third Circuit's affirmance of the nationwide class-action settlement apparently allayed these fears.

But the Kentucky settlement's indemnification provision, which is contained in the side letter to the settlement agreement, was expressly limited to $7.5 million—an amount that the lawyers had already set aside. Moreover, the $59 million had been transferred from the escrow account into the lawyers' personal accounts, which suggests that they never intended to give any of it back to their clients. Gallion's proffered explanations also fail to explain the lies and misrepresentations that he and the other lawyers made to numerous clients about the details of the settlement. The evidence presented at trial was therefore sufficient for a reasonable juror to conclude that Gallion's explanation for his actions was simply not credible, and that he had formed the intent to defraud beyond a reasonable doubt.

### b.     *Interstate wire communications in furtherance of the scheme*

Gallion next argues that even if the evidence were sufficient to support a finding of intent to defraud, it was insufficient to support the conclusion that he used interstate wire communications in furtherance of the alleged scheme. In making this argument, Gallion concedes that he and Cunningham engaged in interstate wire communications when they accepted director fees from the Fund. But he disputes that these communications were made *in furtherance of* the scheme.

Gallion's argument rests on an overly narrow definition of the scheme to defraud that was alleged in this case. According to Gallion, the wire transfers occurred after the fraud was complete because, by that time, the clients had already been deprived of their money. But the fraudulent scheme as alleged by the government was not simply that the

lawyers intended to deprive their clients of money; it was that the lawyers intended to deprive their clients of money *and then retain that money for themselves.* Defined in this manner, the scheme clearly encompassed the wire transfers of settlement funds from the escrow account to the defendants' personal bank accounts, some of which were located outside Kentucky. Similarly, the scheme included the wire transfers of director fees, which were taken from funds rightfully belonging to the clients, to the defendants' bank accounts. *See United States v. Warshak*, 631 F.3d 266, 311 (6th Cir. 2010) (noting in the analogous context of mail fraud that "the requirement of mailing in furtherance of the scheme" is "fairly expansive" and includes mailings that are "incident to an essential part of the scheme, or a step in the plot" (internal quotation marks omitted)). The evidence supporting this element was therefore sufficient to sustain Gallion's wire-fraud convictions.

### 3.    *Evidence of conspiracy to commit wire fraud*

This brings us to the last of Gallion's insufficiency-of-the-evidence arguments: his claim that the evidence was insufficient to sustain his conspiracy conviction. To secure a conviction for conspiracy to commit wire fraud, the government must prove beyond a reasonable doubt that the defendant "knowingly and willfully joined in an agreement with at least one other person to commit an act of [wire] fraud and that there was at least one overt act in furtherance of the agreement." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005) (internal quotation marks omitted). Based on the facts previously discussed, the evidence in this case was easily sufficient to support the inference that the defendants agreed to participate in a conspiracy to commit wire fraud. And the evidence was also sufficient to establish numerous overt acts in furtherance of the conspiracy, as detailed above.

### B.    **Timeliness of the indictments**

Gallion next argues that both the original and superseding indictments issued against him were barred by the five-year statute-of-limitations period. *See* 18 U.S.C. § 3282(a). "We review *de novo* a district court's denial of a motion to dismiss an

indictment on statute of limitations grounds." *United States v. Watford*, 468 F.3d 891, 908 (6th Cir. 2006).

The original indictment was issued in June 2007. It alleged that the conspiracy to commit wire fraud lasted from May 2001 to June 2005, when the defendants stopped receiving director fees from the charitable trust. The superseding indictment was issued in September 2008, and it alleged the same facts. It also charged the defendants with eight specific counts of wire fraud based on communications that occurred between March and December 2004.

"Normally, the date of the last overt act in furtherance of the conspiracy alleged in the indictment begins the clock for purposes of the five-year statute of limitations." *United States v. Schaffer*, 586 F.3d 414, 423 (6th Cir. 2009) (brackets and internal quotation marks omitted). But the duration of the scheme to defraud is a question of fact for the jury. *See* Sixth Circuit Pattern Jury Instruction § 3.12. In this case, the indictments alleged that the last overt act in furtherance of the conspiracy took place in June 2005, and there was ample evidence for the jury to so find. *See United States v. Gibson*, 409 F.3d 325, 336 (6th Cir. 2005) (holding that, although the jury did not specify the acts upon which it convicted the defendant, there was "ample evidence" that the defendants committed the last overt act in furtherance of the conspiracy within the statute-of-limitations period). The indictments were therefore timely.

Gallion's argument to the contrary rests on the same flawed premise as his insufficiency-of-the-evidence argument: that the "fraud ended when the second and final distribution was made to the clients, the attorneys took their fees, or, at the very least, when the remaining monies were set aside for the creation of the Cy Pres Trust." But Gallion was paid director fees until June 2005. "[C]ase law gives ample support to the proposition that payment is an integral and often final term in a conspiracy." *Schaffer*, 586 F.3d at 424 (internal quotation marks omitted). Because Gallion's argument fails to account for that proposition, he cannot show that the indictments in this case were barred by the five-year statute of limitations.

**C.    The nature of the settlement**

Cunningham and Gallion next assert that the district court violated their Sixth Amendment rights to a jury trial, their due process rights to present a defense, and the law-of-the-case doctrine when the court instructed the jury that the state-court settlement was "an aggregate settlement of 440 claims" rather than a class-action settlement. We review de novo a claim that a district court's ruling violates the Constitution. *See United States v. Davis*, 577 F.3d 660, 666 (6th Cir. 2009) (Sixth Amendment); *United States v. Tarwater*, 308 F.3d 494, 507 (6th Cir. 2002) (due process). But a claim that the district court violated the law-of-the-case doctrine is subject to the more deferential abuse-of-discretion standard of review. *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002).

*1.    Constitutional claims*

"The Fifth Amendment to the United States Constitution guarantees that no one will be deprived of liberty without 'due process of law'; and the Sixth, that 'in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury.'" *United States v. Gaudin*, 515 U.S. 506, 509-10 (1995) (brackets omitted). Cunningham and Gallion argue that the district court violated these constitutional provisions by deciding, as a matter of law, that the state-court settlement "was an aggregate settlement of 440 claims" and not a class-action settlement.

Their argument takes the form of a syllogism: (A) the nature of the settlement agreement is a mixed question of law and fact, in that it involves the application of law to fact; (B) mixed questions of law and fact are for the jury to decide; (C) the nature of the settlement was therefore for the jury to decide. The government responds by disagreeing with premises A and B of the syllogism.

As to premise A, the government contends that "the legal characterization of the defendants' settlement agreement with AHP—as an aggregate settlement or a class action settlement—was a question of law" because "the answer to that question did not turn on factual issues." It instead "depended on the plain language of the agreement."

And if the question was one of law, then it was one for the judge to decide. *See Gaudin*, 515 U.S. at 513 (noting the century-old precedent that "[i]n criminal cases, as in civil, . . . the judge must be permitted to instruct the jury on the law and to insist that the jury follow his instructions"); *see also United States v. Mentz*, 840 F.2d 315, 319 (6th Cir. 1988) ("The trial judge instructs the jury on the law applicable to the issues raised and, in appropriate circumstances, may comment on the evidence." (footnote omitted)).

The problem with the government's view is that "[t]here is no categorical distinction between 'legal' and 'factual' questions, for in every case application of a legal principle turns on the presence of particular facts." *United States v. Johnson*, 718 F.2d 1317, 1321 (5th Cir. 1983) (en banc) (footnote omitted); *see also Pullman-Standard v. Swint*, 456 U.S. 273, 288 (1982) (noting the "vexing nature of the distinction between questions of fact and questions of law"). Whether the settlement agreement at issue here was an aggregate settlement or a class-action settlement "depends upon the probative value of evidence" produced at trial, including the settlement agreement itself, no matter how clear that evidence may have seemed. *See Johnson*, 718 F.2d at 1324. The defendants are therefore correct that the nature of the settlement is a mixed question of law and fact, even if the mix weighs heavily on the "law" side.

This brings us to premise B of the defendants' argument—that mixed questions of law and fact are for the jury to decide. Underlying this premise is the basic precept that "the jury's constitutional responsibility is not merely to determine the facts, but to apply the law to those facts and draw the ultimate conclusion of guilt or innocence." *See Gaudin*, 515 U.S. at 514. For this reason, "the application-of-legal-standard-to-fact sort of question . . . , commonly called a 'mixed question of law and fact,' has typically been resolved by juries." *Id.* at 512.

But context matters:

It is commonplace for the same mixed question of law and fact to be assigned to the court for one purpose, and to the jury for another. The question of probable cause to conduct a search, for example, is resolved by the judge when it arises in the context of a motion to suppress evidence obtained in the search; but by the jury when it is one of the

> elements of the crime of depriving a person of constitutional rights under
> color of law.

*Id.* at 521.  In other words, the question of whether the judge or a jury decides an issue "rests not on a distinction between questions of law and questions of fact, but rather the issue is the role of the jury in the trial guaranteed to the accused."  *United States v. White Horse*, 807 F.2d 1426, 1430 (8th Cir. 1986) (brackets and internal quotation marks omitted).

As to that issue, the caselaw provides a clear answer:  "The Constitution gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of *every element of the crime with which he is charged*."  *Gaudin*, 515 U.S. at 522-23 (emphasis added); *see also Mentz*, 840 F.2d at 320 ("There can be little doubt that a trial judge commits error of constitutional magnitude when he instructs the jury as a matter of law that a fact essential to conviction has been established by the evidence, thus depriving the jury of the opportunity to make this finding." (internal quotation marks omitted)).  Under this rule, if a mixed question of law and fact constitutes an element of the offense, the question goes to the jury; if it does not, then the judge may resolve the question without invading the jury's province.

The defendants in this case were charged with the crimes of wire fraud and conspiracy to commit wire fraud.  Neither of these crimes contains as an element of the offense the requirement that the fraud occur in connection with an aggregate settlement.  *See* Part II.A. above (setting forth the elements of the offenses).  Indeed, the judge in the first trial assumed that the state-court action was settled as a class-action settlement, and yet the jury was still free to find that the defendants were guilty.  And the opposite is also true:  the jury in the second trial was free to find that the defendants were not guilty even though the judge ruled that the state-court action was settled as an aggregate settlement.  That is, the judge's instructions did not "ha[ve] the effect of relieving the government of its burden of proving, beyond the *jury's* reasonable doubt, that the accused committed the crimes charged."  *See Mentz*, 840 F.2d at 320 (emphasis in original).  As the government correctly points out, the defendants "were free to—and

did—argue that they did not intend to defraud their clients because they did not know that they were subject to the requirements of the aggregate settlement rule." They just could not "argue that the rule did not apply in the first place."

To be sure, the mixed question of law and fact at issue in the present case bears on—even if it is not determinative of—an element of the crimes with which the defendants were charged. It determines whether the defendants violated Kentucky's aggregate-settlement rule, which in turn is evidence of an intent to defraud. But it does so in the same way as do questions regarding the admissibility of evidence, the competency of witnesses, and the voluntariness of confessions. And yet judges routinely make theses kinds of decisions. *See Gaudin*, 515 U.S. at 525-26 (Rehnquist, C.J., concurring).

Here, the district court ruled that the state-court settlement was an aggregate settlement, not a class-action settlement, because the agreement by its own terms covered the claims of a specific number of known individuals and not the claims of anyone else. That ruling finds support in the state court's treatment of the settlement, including that court's failure to direct notice to all class members after approving the settlement, as would ordinarily have been required by Rule 23.05 of the Kentucky Rules of Civil Procedure had the case been settled as a class action. And the district court's ruling finds further support in the defendants' own admissions to the KBA; specifically, their admission that they violated Kentucky's aggregate-settlement rule, which does not apply to class-action settlements. In short, the district court's ruling was correct as a matter of law and did not invade the province of the jury or otherwise violate the defendants' constitutional rights.

### 2.     *Law-of-the-case doctrine*

The defendants argue in the alternative that the district court's ruling violates the law-of-the-case doctrine, which holds that "a decision on an issue made by a court at one stage of a case should be given effect in successive stages of the same litigation." *United States v. Todd*, 920 F.2d 399, 403 (6th Cir. 1990). "This doctrine applies with equal vigor to the decisions of a coordinate court in the same case and to a court's own

decisions," and "can be applied to rulings made in a case that ends in a mistrial." *Id.* at 403, 404.

The key word here is "can." "Unlike *stare decisis* or collateral estoppel, the 'law of the case' doctrine is not a rigid rule. Rather, it is a discretionary tool that courts use to promote efficiency." *United States v. Perez*, 178 F.3d 1297 (table), 1999 WL 196501, at *3 (6th Cir. 1999) (unpublished opinion). And a court's discretion to use this tool is at its apex in the context of a retrial following a mistrial, because a retrial of a case is exactly what it says; it is a re*trial*, not a replay. *See United States v. Palmer*, 122 F.3d 215, 221 (5th Cir. 1997) ("A retrial following a mistrial is both in purpose and effect a new trial. . . . [T]he two are entirely separate affairs."). A district court "retains the power to reconsider previously decided issues as they arise in the context of a new trial." *Todd*, 920 F.2d at 404.

In applying this standard to the facts of the present case, we find no abuse of discretion. The district judge in the first trial assumed that the state-court lawsuit was settled as a class action. A different district judge in the second trial undertook his own evaluation of the issue and determined just the opposite. We are persuaded that the latter determination was the correct one and thus find no error on this issue.

**D.     Exclusion of proposed expert testimony**

The defendants next claim that the district court impermissibly excluded the testimony of their proposed expert witness, attorney Richard L. Robbins. Robbins testified as an expert witness in the first trial and, the defendants assert, should have been permitted to do so again. We review a district court's ruling "excluding expert testimony under an abuse-of-discretion standard." *United States v. Martinez*, 588 F.3d 301, 323 (6th Cir. 2009).

### *1.     Robbins's proposed testimony*

The written report submitted by Robbins lists his extensive experience litigating complex business matters, including class actions.  Drawing on that experience, he sought to provide opinions regarding

> the responsibility to provide notice to the putative class members; whether the class action was properly decertified; whether Mr. Gallion could properly hold back settlement funds for future contingencies pursuant to a settlement agreement; the propriety of attorney fees in awards in class actions or mass plaintiff actions; and whether a "<u>cy pres</u>" distribution of settlement funds is an appropriate practice in class action [sic].

(Emphasis in original.)  In particular, Robbins sought to testify that, based on his review of the case, the state-court action was extremely complicated and that, although the defendants' actions "were clearly innovative," they "do not show a violation of law, and certainly [are] not indicative of any intent to defraud or other wrongful motive."  He also opined that the defendants were justified in relying on the advice and guidance of Chesley and the orders issued by Judge Bamberger; that the state-court action was settled as a "quasi-class action"; that "it would be difficult, if not impossible, to establish that there was any intent to violate class action law"; that "there was nothing improper" about the *cy pres* distribution; and that any dispute between the clients and the defendants over attorney fees "is a civil matter that should be . . . handled in a civil setting."

Robbins added in his report that he thought the defendants "had an arguable basis" for "retaining certain payments above and beyond the percentages set forth in the settlement agreements."  He gave two reasons for this conclusion.  The first was the side letter, which Robbins read as placing no limitation on the amount of the indemnification. And the second was the state court's approval of the defendants' request for attorney fees, which Robbins thought made "it appropriate for . . . counsel to rely on such approval."

After reviewing Robbins's report, the district court conducted a *Daubert* hearing and—in a memorandum opinion prepared prior to the hearing and released a few minutes thereafter—concluded that "Robbins is not qualified to testify to the opinions sought to be introduced by the Defendants" and, further, that "even if he were qualified, the opinions Robbins seeks to express are inadmissible for a variety of reasons." *United States v. Gallion*, 257 F.R.D. 141, 144 (E.D. Ky. Mar. 30, 2009). The court therefore excluded the testimony in its entirety.

### 2. *Whether Robbins qualified as an expert*

We first consider whether the district court abused its discretion when it ruled that Robbins was not qualified to testify as an expert. Rule 702 of the Federal Rules of Evidence provides the touchstone for expert testimony. That rule, which reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), reads as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under this rule, "expert witnesses must be qualified to testify to a matter relevant to the case." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir. 2007). "[A] proffering party can qualify their expert with reference to his 'knowledge, skill, experience, training or education.'" *Id.* The defendants sought to qualify Robbins based on his record of participation in numerous class actions and multi-

plaintiff cases. But the district court refused to qualify him as an expert, citing "concerns about qualifying Robbins, or any witness, as an expert on an area of the law solely on the basis of work experience in a particular area." *Gallion*, 257 F.R.D. at 148. The court supported its ruling by quoting *Cicero v. Borg-Warner Auto., Inc.*, 163 F. Supp. 2d 743 (E.D. Mich. 2001), where the district court noted that "something more than time in practice would be required to qualify an attorney as an expert in a given specialty," *id.* at 749 n.7.

Cunningham and Gallion argue that the district court's refusal to qualify Robbins as an expert was erroneous because, under the plain language of Rule 702, experience alone may be enough to qualify a witness as an expert. To a certain degree they are right—experience alone may be enough. Indeed, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." Fed. R. Evid. 702 advisory committee's notes (2000 amendments); *see also Kumho*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized expertise.").

But "may" does not mean "must." Whether a proposed expert's experience is sufficient to qualify the expert to offer an opinion on a particular subject depends on the nature and extent of that experience. *Compare United States v. Lupton*, 620 F.3d 790, 799 (7th Cir. 2010) (noting that a proposed expert's "thirty-year distance from the day-to-day goings-on in the brokerage world and lack of experience with the statutes and contract at issue in this case call into question the extent to which [he is qualified] to render an opinion" on the industry standards of practices among local real-estate brokers), *with First Union Nat'l Bank v. Benham*, 423 F.3d 855, 862-63 (8th Cir. 2005) (holding that an attorney with over 36 years of experience practicing in the area of mergers and acquisitions was qualified to provide expert testimony on the issue of legal malpractice in that field).

The question in the present case, therefore, is whether Robbins's experience litigating complex business matters was sufficiently "extensive and specialized" to qualify him as an expert on complex litigation, class actions, and mass-tort cases. *See*

*Kumho*, 526 U.S. at 156. In deciding that he lacked the necessary qualifications, the district court noted that Robbins did not show that he had "written or spoken professionally on any of the issues on which he [sought] to offer opinions." *Gallion*, 257 F.R.D. at 148. "Without these or other differentiating factors," the court reasoned, "there is nothing to set Robbins apart from any other lawyer with experience as an advocate in a particular area of law," and "[s]urely, not every lawyer with such experience qualifies as an expert in his or her practice area." *Id.*

We agree that not every lawyer with experience as an advocate in a particular area of law necessarily qualifies as an expert in his or her practice area. But Robbins's experience, which consisted of nearly 30 years in business litigation and included involvement in numerous class actions and multi-plaintiff cases, is far more substantial than the typical attorney's. And any deficiencies in his professional background or credentials could have been probed on cross-examination—"the traditional and appropriate means of attacking shaky but admissible evidence." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993). We therefore have grave doubt about the soundness of excluding Robbins's testimony on the basis that he was not qualified as an expert.

The district court, however, provided an alternative basis for excluding Robbins's testimony that is distinct from his potential lack of sufficient expertise. Because we think that this alternative basis fits more readily within the court's "broad discretion" to make admissibility determinations, *see Surles*, 474 F.3d at 295, we will assume without deciding that Robbins qualified as an expert. We now turn to the court's alternative basis for excluding his testimony.

### 3.     *Whether Robbins's testimony was inadmissible for other reasons*

Qualifying an expert by "knowledge, skill, experience, training, or education" is only the first hurdle to clear under Rule 702. An expert's proposed testimony must meet two additional requirements to be admissible: it must be (1) relevant, meaning that the testimony "will help the trier of fact to understand the evidence or to determine a fact in issue," and (2) reliable. Fed. R. Evid. 702; *see also In re Scrap Metal Antitrust Litig.*,

527 F.3d 517, 529 (6th Cir. 2008).  In making these dual determinations, the district court acts "in the role of 'gatekeeper'" and must "evaluat[e] the relevance and reliability of proffered expert testimony with heightened care." *Surles*, 474 F.3d at 295.  The court below evaluated the relevance and reliability of Robbins's testimony and concluded that the testimony was in some places irrelevant, in some places unreliable, and in some places both.  This conclusion provides an adequate basis for excluding the testimony and was not an abuse of discretion.

To begin with, Robbins's proposed testimony was rooted in the belief that the state-court lawsuit was settled as a "quasi-class action."  That belief was in direct conflict with the district court's legal conclusion that the case was settled as an aggregate settlement, and thus Robbins's opinions relating to class actions—including how they are usually settled, the frequency of *cy pres* distributions in class-action settlements, and the rights of class members—would have been both irrelevant and confusing to the jury.

Moreover, Robbins's testimony from the first trial contained numerous misstatements of the law.  He took the position, for example, that even if Kentucky's aggregate-settlement rule applied to the settlement, the defendants did not have to comply with the rule because, "[i]n my opinion, it would have been extremely risky for these lawyers to disclose the entire settlement amount to these claimants.  And in my opinion, I think it has little, if no relevance to the claimants."  Robbins also explained that the defendants did not need to provide notice to the class prior to the dismissal of the class action.  Both of these statements are in conflict with Kentucky law.  *See* Ky. Sup. Ct. R. 3.130(1.8)(g) (the aggregate-settlement rule); Ky. R. Civ. P. 23.05 (requiring notice prior to the dismissal of a class action).

Robbins's report contained additional legal misstatements.  To take just one example, he believed that the defendants were justified in "retaining certain payments above and beyond the percentages set forth in the settlement agreements," in part because he read the side letter's indemnity provision as placing no limitation on the amount of potential indemnification.  But this is not a correct interpretation of the side letter.  The last sentence of the side letter makes clear that "the Settling Attorney and

Settling Claimants shall not be obligated to indemnify AHP for attorneys fees and expenses *nor for any amount in excess of $7,500,000*." (Emphasis added.) This sentence places a hard cap on any indemnification amount and, properly understood, did not give the defendants license to set aside more than $7,500,000 of the settlement amount to cover potential indemnification.

Gallion testified that he somehow misread or misunderstood the side letter's final sentence. But Robbins did not seek to testify as to Gallion's understanding of the side letter at the time that it was signed (about which Robbins was in no position to know). Robbins instead sought to testify as to the legal effect of the document. On this point, he was simply wrong. And the district judge—the only person in the courtroom vested with the authority to definitively interpret the law—did not abuse his discretion by excluding this and other legal misstatements under Rule 702.

Finally, in his report, Robbins offered his opinion that the defendants lacked the requisite criminal intent to defraud. The district court properly refused to admit this opinion and others like it on the ground that they were impermissible under Rule 704(b) of the Federal Rules of Evidence. *See* Fed. R. Evid. 704(b) ("In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.").

Despite all these problems with Robbins's testimony, the defendants nevertheless lodge three objections to the district court's decision to exclude the same. The first concerns the timing of the district court's memorandum opinion, which was released a few minutes after the *Daubert* hearing had concluded. According to the defendants, the district court erred by arriving at the hearing with a written opinion already in hand, particularly because there was no expectation that the judge would immediately issue a ruling at the end of the hearing.

But even if, under such circumstances, the better practice is for judges to prepare their written opinions after having had the benefit of hearing the parties orally argue their positions, this does not mean that the district court erred by not doing so here. The

defendants cite no authority for the proposition that a district court's decision to prepare an opinion in advance of a hearing is grounds to set aside that opinion on appeal. This proposition seems especially dubious in the context of a *Daubert* hearing, a hearing that this court has held is not even required where "the record on the expert testimony was extensive, and the *Daubert* issue was fully briefed." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 532 (6th Cir. 2008).

The district judge here presumably used the *Daubert* hearing as a final opportunity for the defendants to dissuade him from the analysis set forth in the tentative opinion, an endeavor in which they were obviously unsuccessful. Their lack of success, however, provides them with no basis to set aside the ruling. We therefore reject the defendants' first argument.

The defendants' second argument is that, even if Robbins's testimony contained incorrect statements of the law and other inadmissible opinions, the district court "should have simply limited Robbins's testimony on those particular areas rather than reject his opinions wholesale." But we find this argument equally unpersuasive. The court undertook a thorough analysis of nearly every sentence of Robbins's report and provided adequate reasons for excluding all of his major points. Had Robbins's testimony been limited to what the court concluded was permissible, he would have been left with nothing useful to tell the jury. The district court did not abuse its discretion by preventing this pointless exercise.

This leads to the last of the defendants's objections—that "the jury should have been allowed to hear Mr. Robbins' testimony on the actual practice of attorneys, as opposed to merely [the] 'ivory tower' ideals" of the government's expert witness, Professor Howard M. Erichson. Professor Erichson testified that, based on his review of the documents related to the state-court action and on his expertise as a law professor specializing in complex litigation and legal ethics, he was of the opinion that the case was settled not as a class action but as an aggregate settlement. He further testified regarding the ethical obligations that arose as a consequence of this determination, including the defendants' duty to comply with Kentucky's aggregate-settlement rule.

The district court allowed Professor Erichson's testimony because the court concluded that he had accurately stated the law and that his testimony would be helpful to the jury. Although the defendants may see this as expressing a preference for "ivory tower" ideals, the district judge was under no obligation to allow into evidence irrelevant, unreliable, and potentially confusing testimony for the sole purpose of leveling the playing field. The judge had the authority to agree with one side and not the other on a particular interpretation of the law. In sum, the court did not abuse its considerable discretion in prohibiting Robbins from testifying as an expert witness.

**E.     Testimony related to the KBA's disciplinary investigation**

The defendants also argue that the district court erred when it admitted certain testimony relating to the KBA's investigation into the defendants' handling of the settlement. A district court's evidentiary rulings will generally not be reversed unless the court abused its discretion. *United States v. Davis*, 577 F.3d 660, 666 (6th Cir. 2009). But "where the evidentiary issues relate to a claimed violation of the Sixth Amendment," the de novo standard of review applies. *Id.*

### 1.     *The district court's evidentiary rulings*

Linda Gosnell handled the KBA's investigation of the defendants and testified about the investigation at trial. In her testimony, she (1) provided a summary of the relevant Kentucky ethics rules; (2) gave details related to the KBA's investigation; (3) recounted the defendants' admissions to the Kentucky Supreme Court; and (4) read directly from the Kentucky Supreme Court's disbarment decisions with regard to Cunningham and Gallion, including portions of the Court's factual findings. Gosnell did not read the allegations contained in the decisions—the 22 ethical violations charged to each defendant—but the government concedes that some of these allegations were shown to the jury during Gosnell's testimony.

The defendants unsuccessfully objected to this testimony in the district court. They moved for a mistrial after Gosnell had testified, arguing that they had no opportunity to rebut the information contained in the disbarment opinions and that the

testimony violated both Rule 403 of the Federal Rules of Evidence and the Confrontation Clause of the Sixth Amendment.  The district court denied the mistrial motion.

But the district court later redacted the factual findings and charges from the copy of the disbarment opinions given to the jury and instructed the jury to consider Gosnell's testimony "only to the extent that she was able to authenticate the documents as Kentucky Supreme Court opinions."  Moreover, the court instructed the jury that, "[s]tanding alone, a violation of an ethical rule is not evidence or proof that a defendant committed the criminal acts alleged in the indictment," in part because "the burden of proof used to render the [Kentucky Supreme Court's disbarment decisions] is different from the burden of proof used in this trial."

### 2.      *Admissibility of the evidence*

On appeal, the defendants raise several arguments as to why the district court's evidentiary rulings were in error.  They claim that (1) their admissions to the KBA were barred by Rule 403 of the Federal Rules of Evidence; (2) Gosnell's recitation of the factual findings from the disbarment decisions was hearsay and violated the defendants' Sixth Amendment right to confront witnesses; and (3) the charging  allegations contained in the disbarment decisions were inadmissible under Rule 403.

As to the first argument, the defendants' admissions to the KBA were relevant to the case and admissible as a party's own statement under Rule 801(d)(2)(A) of the Federal Rules of Evidence (permitting a party's own statement to be offered as evidence against that party even where the statement would otherwise be inadmissible as hearsay).  So the only possible barrier to admissibility is Rule 403 of the Federal Rules of Evidence, which provides in pertinent part that a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."

"In reviewing whether evidence is admissible under Rule 403, this court looks at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect."  *United States v. Fraser*, 448 F.3d 833, 840 (6th

Cir. 2006) (brackets and internal quotation marks omitted).  The probative value of the admissions in this case was high.  Even Cunningham concedes as much.  The question is whether that high probative value was "*substantially* outweighed by a danger of . . . *unfair* prejudice, confusing the issues, [or] misleading the jury."  *See* Fed. R. Evid. 403 (emphasis added).

Viewing the evidence in the light most favorable to the government, the defendants have failed to meet this heavy burden.  At trial, the defendants' theory of the case was that they relied in good faith on Chesley and Judge Bamberger and did not know that Kentucky's aggregate-settlement and other ethical rules applied to the settlement.  The defendants were able to present this theory to the jury despite the fact that their admissions of wrongdoing to the Kentucky Supreme Court were introduced into evidence.  In addition, the district court limited the prejudicial impact of the admissions by instructing the jury that "proof of an ethical violation is not conclusive as to whether a criminal violation occurred."  "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and the record provides no basis to believe that the jury here did otherwise.

The defendants' second objection relates to the admissibility of the factual findings from the disbarment decisions, which Gosnell read aloud to the jury.  Here, the defendants stand on firmer ground.  But even assuming that the admission of these factual findings constituted inadmissible hearsay and violated the Sixth Amendment's Confrontation Clause, the defendants' argument would still fail because any error was harmless.  *See* Fed. R. Crim. P. 52(a) (stating that any error "that does not affect substantial rights must be disregarded"); *United States v. Henderson*, 626 F.3d 326, 333 (6th Cir. 2010) (noting that "violations of the Confrontation Clause are subject to harmless error analysis").

The evidence of the defendants' guilt in this case was overwhelming and independently supported all the factual findings from the disbarment proceedings.  For example, the Kentucky Supreme Court determined that many of the defendants' clients were told that they could go to jail if they discussed the terms of the settlement with

others, but this fact had already been established by the trial testimony of numerous clients. The Kentucky Supreme Court also found that some of the settlement money had been improperly deposited by the defendants into their personal bank accounts, but that determination too had been established by other evidence, including the defendants' admissions, bank records, and client testimony.

In other words, the factual findings in the disbarment decisions were "cumulative of information that was properly admitted." *See Hamblin v. Mitchell*, 354 F.3d 482, 496 (6th Cir. 2003). Moreover, the district court ultimately instructed the jury to disregard the part of Gosnell's testimony that included these factual findings. And the court redacted the findings from the copy of the disbarment decisions given to the jury for its deliberations. Any error regarding the findings therefore did not affect the defendants' "substantial rights" and "must be disregarded." *See* Fed. R. Crim. P. 52(a).

The defendants further object to the admissibility of the allegations charged in the disbarment decisions, some of which were briefly shown to the jury while Gosnell testified. Here, too, any error was harmless. Gosnell did not read the allegations aloud to the jury, the allegations were redacted from the jury's copy of the disbarment decisions, and the other evidence of guilt was overwhelming.

**F.     Cross-examination of witnesses**

The defendants next contend that their constitutional rights were violated when they were precluded from asking questions on cross-examination related to any KBA disciplinary investigations into the conduct of Judge Bamberger, Chesley, and Helmers. "We review a district court's decision to limit the scope of cross-examination under the abuse-of-discretion standard." *United States v. Howard*, 621 F.3d 433, 456 (6th Cir. 2010).

"A criminal defendant has the constitutional right to confront the witnesses against him, but this right is not absolute." *Id.* (internal quotation marks omitted). "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns

about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

The defendants argue that the district court in this case exceeded its "wide latitude" because the court effectively precluded defense counsel from cross-examining Judge Bamberger, Chesley, or Helmers "regarding any potential disciplinary proceedings against them, a fact that potentially may have demonstrated bias and motive on the part of these witnesses." But this argument fails to take into account two important considerations.

First, the district court's limitation on cross-examination was based on a sound reason: disciplinary proceedings are confidential in Kentucky until there has been a determination that an ethical violation actually occurred. *See* Ky. Sup. Ct. R. 3.150(1). And second, "the jury had enough information to assess the defense's theory of the case despite the limits placed on cross-examination." *See United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009). The defendants were able to question the witnesses about possible bias—including the prosecutorial immunity that Chesley and Helmers received in exchange for their testimony—and the court instructed the jury to consider with "more caution" the testimony of Chesley and Helmers for this reason. On these facts, there was no abuse of discretion.

**G.     Amount of restitution**

Gallion also appeals the amount of restitution ordered by the district court, claiming that it was excessive, unduly punitive, and not supported by the evidence. We review the amount of restitution ordered by the district court for an abuse of discretion. *United States v. Bogart*, 576 F.3d 565, 569 (6th Cir. 2009).

The Mandatory Victims Restitution Act of 1996, codified at 18 U.S.C. §§ 3663A-3664, provides that the district court, when sentencing a defendant who has committed a crime such as fraud, "shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of

the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A). Here, the district court complied with this provision, ordering the defendants to pay $127,678,834.05 in restitution to their fen-phen clients. This sum was calculated based on the total amount that the clients were entitled to under the settlement, without any reduction for the attorney fees that the defendants were due to receive according to their respective retainer agreements.

In making this calculation, the district court relied on *United States v. Hoglund*, 178 F.3d 410 (6th Cir. 1999). *Hoglund* involved an attorney who settled his clients' claims without their permission, forged their signatures on settlement checks, and deposited the money into his personal account. He was subsequently found guilty of bank fraud in federal district court and was ordered to pay restitution to his victims.

On appeal, Hoglund made the same argument that Gallion makes here: that the district court erred by "not deduct[ing] from the restitution amount the one-third contingent attorney fee pursuant to [his] contract with his clients." *Id.* at 411. This court rejected that argument, holding that "a settlement sum does not belong jointly to the attorney and the client," but "to the plaintiff alone." *Id.* at 414. The court acknowledged that the clients may each have a "separate contractual obligation to pay Hoglund a sum equal to one-third of the settlement amount as a fee for his services." *Id.* But "such obligations," the court made clear, "do not diminish the clients' entitlement to the full settlement amount." *Id.* "If Hoglund is to receive the one-third contingency fee arrangement to which he claims entitlement, he must enforce his contract, and he is free to attempt to do so." *Id.*

*Hoglund*'s holding is on all fours with the present case, and we are not free to rule otherwise. *See Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985) (noting that "[a] panel of this Court cannot overrule the decision of another panel . . . unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision"). The district court therefore did not err in calculating the restitution amount based on the total value of the settlement.

**H.    Mistrial due to counsel's health problems**

Gallion next argues that the district court should have declared a mistrial based on his counsel's health problems during trial. But Gallion did not move for a mistrial in the district court, so his claim is reviewed "only for plain error." *See United States v. Caver*, 470 F.3d 220, 245 (6th Cir. 2006). This means that, in order to prevail, he must show that the district court's failure to declare a mistrial was a clear error that affected his substantial rights and "that this adverse impact seriously affected the fairness, integrity or public reputation of the judicial proceedings." *See United States v. Eversole*, 487 F.3d 1024, 1029 (6th Cir. 2007) (internal quotation marks omitted).

Gallion has not even attempted to meet this high bar here, and any such attempt would be futile. When his counsel became ill during the trial, the district court appointed interim counsel to represent him and then continued the case. The trial resumed when Gallion's regular counsel returned a week later. We find no error, plain or otherwise, in utilizing this procedure.

**I.    Waiver of Cunningham's right to a unanimous verdict**

Finally, Cunningham claims that a constitutional violation occurred during his first trial when the district court refused to permit him to waive his constitutionally protected right to a unanimous jury verdict. This question has created a split among the circuits.

On one side is the rule adopted by the Eleventh Circuit in *Sanchez v. United States*, 782 F.2d 928 (11th Cir. 1986), which holds that a criminal defendant may waive his constitutional right to a unanimous verdict "under very limited circumstances," so long as certain criteria are met. *See id.* at 932-35. Cunningham asks us to adopt that rule in this case.

But in doing so, Cunningham concedes that the Sixth Circuit has come down on the other side of the split. In this circuit—as in every circuit to consider the issue other than the Eleventh—verdicts in criminal cases must be unanimous. *See, e.g.*, *Hibdon v. United States*, 204 F.2d 834, 838 (6th Cir. 1953) (holding that "the right to a unanimous

verdict cannot under any circumstances be waived" and that "it is of the very essence of our traditional concept of due process in criminal cases"). This court has reaffirmed that fundamental rule at least once since 1953, *see United States v. Smedes*, 760 F.2d 109, 113 (6th Cir. 1985), and because the rule squarely decides the issue here, we do so again now. *See Salmi*, 774 F.2d at 689.

### III. CONCLUSION

For all the reasons set forth above, we **AFFIRM** the judgment of the district court.