**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ELVIN ALISURETOVE,

      Defendant-Appellant.

No. 14-7050

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 6:13-CR-00062-RAW-2)**

---

Barry L. Derryberry, Research & Writing Specialist, (Julia L. O'Connell, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Tulsa, Oklahoma, for Defendant-Appellant.

Linda A. Epperley, Assistant United States Attorney, (Mark F. Green, United States Attorney, and Douglas A. Horn, Assistant United States Attorney, with her on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.

---

Before **BRISCOE,** Chief Judge, **GORSUCH** and **McHUGH**, Circuit Judges.

---

**BRISCOE**, Chief Judge.

Defendant Elvin Alisuretove[1] pleaded guilty to one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, arising out of his role in a scheme that involved "skimming" debit card account information from convenience store gas pumps and then using that account information to make cash withdrawals from automated teller machines (ATMs). Alisuretove was sentenced to a term of imprisonment of 63 months, to be followed by a 36-month term of supervised release. He was also ordered to pay restitution in the amount of $240,682.27. Alisuretove now appeals, arguing that the district court, in determining his total offense level and the length of his sentence, erred in calculating the amount of loss associated with his conduct. Alisuretove also argues that the district court erred in determining the amount of restitution owed by Alisuretove under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's calculation of loss associated with Alisuretove's conduct, but reverse the district court's calculation of the amount of restitution owed under the MVRA and remand for resentencing on that issue.

---

[1] The pro se notice of appeal that was filed in this case suggests that the defendant's last name is actually Alisuretov. Because, however, all of the pleadings in this case, including the indictment, refer to him as Alisuretove, we shall use that spelling throughout our opinion. In doing so, we conclude that any misspelling contained in this opinion or in the pleadings is immaterial to the outcome. See Faust v. United States, 163 U.S. 452, 454 (1896) ("A name need not be correctly spelled in an indictment, if substantially the same sound is preserved.").

I

*Factual background*

In late 2012, the Durant, Oklahoma Police Department and several area banks began receiving numerous reports of debit card account fraud by way of unauthorized withdrawals from ATMs. The United States Secret Service was contacted about the matter and became involved in the investigation. It was determined that during November 2012, approximately 242 debit card accounts were compromised in the states of Oklahoma, Texas, and Kentucky. All of the debit cards related to those accounts, it was discovered, had been used to purchase fuel from Murphy's USA, a gas station and convenience store in Durant, Oklahoma. The debit card account information and pin numbers were illegally obtained by a skimming device that had been placed on a single gas pump at that Murphy's USA store.

As the investigation continued, law enforcement discovered that skimming devices had also been placed on gas pumps at other gas stations in Conway and DeQueen, Arkansas, and Muskogee and Idabel, Oklahoma. Using video surveillance footage from various ATMs, law enforcement determined that Alisuretove, Kevin Konstantinov, and another individual were responsible for the fraudulent ATM withdrawals.

Ultimately, law enforcement determined that on several occasions between approximately April 2012 and January 2013, Konstantinov and Alisuretove

traveled from their residences in Seattle, Washington, to Arkansas, Oklahoma and Texas. There, Konstantinov would place skimming devices on the interior of gas pumps. The skimming devices would be left in place for approximately one to two months, during which time the devices would record account information and pin numbers from debit and credit cards used by consumers to purchase fuel at the gas pump. Konstantinov would then retrieve the skimming devices, transfer the "skimmed" account information to counterfeit debit and credit cards, and, with the help of Alisuretove and others, use those counterfeit cards to withdraw large amounts of cash from multiple ATMs. In total, the defendants compromised approximately 524 debit card accounts and made approximately 779 fraudulent withdrawals, totaling $348,376.80.[2] In addition, the defendants attempted unsuccessfully to withdraw $12,480.00.

*Procedural background*

On July 9, 2013, a federal grand jury returned a three-count indictment against Alisuretove and Konstantinov. Count One charged both men with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Two charged Konstantinov with aggravated identity theft, in violation of 18 U.S.C. §1028A(a)(1). Count Three charged Alisuretove with aggravated identity theft, in

---

[2] This amount of loss relates only to debit card accounts. In other words, it does not include losses related to credit card accounts. The stolen credit card numbers were apparently more difficult for the defendants to use than the stolen debit card numbers.

4

violation of 18 U.S.C. § 1028A(a)(1).

On September 19, 2013, Alisuretove pleaded guilty, without benefit of a written plea agreement, to Count One of the indictment, i.e., the conspiracy charge. In doing so, Alisuretove expressly admitted that between April 2012 and January 2013, he traveled with Konstantinov to Oklahoma and elsewhere to carry out a scheme that they had devised to defraud or obtain money by false or fraudulent pretenses from other people.

The probation office prepared a presentence investigation report (PSR). In computing the appropriate offense level, the PSR concluded that, pursuant to U.S.S.G. § 1B1.3(a), Alisuretove was "accountable for his actions and the actions of [Konstantinov]" and thus "the total intended loss attributed to [Alisuretove] [wa]s $360,856.80." ROA, Vol. 3 at 16. This intended loss amount in turn resulted in a 12-level increase to Alisuretove's base offense level. After imposing additional increases related to the number of victims, the use of sophisticated means, and the production of unauthorized access devices, and after applying a 3-level decrease for acceptance of responsibility, the PSR arrived at a total offense level of 26. Based upon this total offense level and a criminal history category of I (Alisuretove had no prior criminal convictions or arrests), the PSR arrived at a Guidelines imprisonment range of 63 to 78 months. The PSR also determined that the MVRA required that restitution be imposed.

Alisuretove filed written objections to certain portions of the PSR. In

5

particular, Alisuretove asserted that, contrary to the factual allegations contained in the PSR, he "did not place skimming devices on gas pumps" or "transfer the stolen information to any debit/credit cards." Id. at 25. Alisuretove did concede, however, that he "served as a driver" and "used counterfeit cards to withdraw money from accounts and . . . [wa]s guilty of conspiracy." Id. In turn, Alisuretove argued that the total intended loss amount listed in the PSR ($360,856.80) was "an overstatement of [his] jointly undertaken criminal activity with . . . Konstantinov." Id. at 26. In support, Alisuretove asserted that "Konstantinov was very secretive as to whether there were any other persons engaged in [the] criminal activity" and "[b]ecause . . . Alisuretove was only involved as a driver and as a person whom would withdraw funds on those occasions at the direction of . . . Konstantinov, it [could not] be said that the actions of any other participants should be considered" reasonably foreseeable to him for purposes of U.S.S.G. § 1B1.3(a). Id. "Thus," he argued, "the amount of loss" attributable to him "should be corrected to reflect only loss that [wa]s connected directly to [his] role as a driver and withdrawer of funds." Id. Relatedly, Alisuretove argued that "the number of victims should [also] be calculated using [his] involvement as a driver and as a person whom [sic] would withdraw funds on certain occasions at the direction of . . . Konstantinov." Id. at 26-27. Finally, Alisuretove argued that the amount of restitution ordered "should reflect only that offense conduct charged in the Indictment and pleaded to by

6

[him]." Id. at 29 (bold font omitted).

On June 11, 2014, the district court held a sentencing hearing for Alisuretove. During the hearing, the district court and the parties discussed Alisuretove's objection to the PSR's proposed total loss calculation and the government presented testimony from United States Secret Service agent Frank Coffman in support of the loss calculation. Coffman testified that the Secret Service possessed "video still pictures showing" Alisuretove "using some of the" account numbers that were "compromised" at the Durant gas station "at ATMs in Oklahoma City." ROA, Vol. 2 at 52. Likewise, Coffman testified that Alisuretove was videotaped at an ATM in Oklahoma City using account numbers compromised at a gas station in Conway, Arkansas. Coffman also testified that the Secret Service had determined, based upon flight records, that Alisuretove took approximately twelve independent trips to facilitate the conspiracy during the time period from 2011 through January 2013. In addition, Coffman testified that Alisuretove, following his arrest, gave a statement to law enforcement admitting that for each trip he received $300 per day for driving and "approximately ten percent of whatever was withdrawn during a certain amount of transactions." Id. at 55. Alisuretove told law enforcement that his total take was approximately $14,000, and that he expressly withdrew from the conspiracy in January 2013 after he got mad at Konstantinov. When asked by defense counsel about Alisuretove's involvement in the conspiracy, Coffman testified that the

7

earliest photo of Alisuretove accessing an ATM was from September 2012 in Oklahoma City, but that the Secret Service also had a "flight record that show[ed] [Alisuretove] in May 2012 in the Oklahoma City area." Id. at 57. On redirect, Coffman testified that the Secret Service also had "a flight record showing that [Alisuretove] took a flight from Seattle to [Dallas] on" April 27, 2012, and returned home by way of Oklahoma City on May 8, 2012. Id. at 65. Notably, Coffman testified that the Secret Service had evidence indicating that Konstantinov was at the Dallas airport and rented a car on the day of Alisuretove's arrival. That car, Coffman testified, was later returned by Konstantinov to the Dallas airport approximately four days after Alisuretove had flown home.

At the conclusion of Coffman's testimony, the district court overruled Alisuretove's objection. In doing so, the district court found that Alisuretove "was highly involved in the scope of the conspiracy," id. at 69, and "was part of this conspiracy when the skimming device was placed on and retrieved from the gas pump in Conway, Arkansas," id. at 70. The district court further found that Alisuretove "made numerous fraudulent withdrawals from ATMs in several states over an extended period of time," many of which "were followed with a withdrawal by" Konstantinov. Id. And, the district court noted, "[o]ther than [Alisuretove]'s statement, [there was] insufficient evidence to show that [Alisuretove] terminated his involvement in the jointly undertaken criminal

8

activity." Id. Consequently, the district court found that "any loss caused by [Konstantinov] was reasonably foreseeable to [Alisuretove] based upon the scope of [Alisuretove]'s agreement in the case." Id. In turn, the district court found "by a preponderance of the evidence" that both the amount of loss and the amount of restitution were "appropriately calculated." Id. at 71, 74.

Ultimately, the district court sentenced Alisuretove to a term of imprisonment of 63 months, to be followed by a 36-month term of supervised release. The district court also ordered Alisuretove to pay restitution in the amount of $240,682.27.

Judgment was subsequently entered in the case and Alisuretove filed a timely notice of appeal.

II

*The district court's loss calculation*

In the first of the two issues he raises on appeal, Alisuretove challenges the district court's calculation, for purposes of U.S.S.G. § 2B1.1(b)(1), of the total amount of loss associated with the conspiracy conviction to which Alisuretove pleaded guilty. The total amount of loss calculated by the district court, $360,856.80, resulted in a 12-level increase to Alisuretove's base offense level. According to Alisuretove, "[t]his amount of loss is clearly erroneous." Aplt. Br. at 11.

Section 2B1.1 of the Sentencing Guidelines establishes the base offense

9

level and certain enhancements for offenses involving counterfeit instruments. Of relevance here, § 2B1.1(b)(1) provides that, "[i]f the loss exceeded $5,000," the base offense level must be increased from 2 to 30 levels depending upon the exact amount of the loss. For example, if the loss was more than $200,000 but less than $400,000, the base offense level must be increased by 12 levels.

A district court's calculation of loss, when preserved by timely objection below, is reviewed for clear error. United States v. Mullins, 613 F.3d 1273, 1292 (10th Cir. 2010). "To reverse under this standard," we must, considering all of the evidence, "have a definite and firm conviction that a mistake has been committed." United States v. Hahn, 551 F.3d 977, 979 (10th Cir. 2008) (internal quotation marks omitted).

This deferential approach in our review of a district court's finding of loss is reflected in the commentary to § 2B1.1. Application Note 3(C), entitled "Estimation of Loss," states that "[t]he [district] court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n. 3(c). It further states that "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence," and "[f]or this reason, the court's loss determination is entitled to appropriate deference." Id.

Alisuretove complains that the district court, in calculating the loss associated with his offense of conviction, erred in adopting the factual findings set forth in paragraphs 14, 15 and 26 of the PSR. Those paragraphs stated as

10

follows:

14. From about April 2012 until January 2013, Konstantinov and Alisuretove, [sic] would obtain account information and personal identification numbers by using a skimming device.

15. The defendants would travel from their residences in Seattle, Washington, to Texas, Oklahoma, and Arkansas. They would then place skimming devices on the interior of gas pumps. The skimming device would be left in place for approximately one to two months. The defendants would then retrieve the skimmer, transfer the stolen or "skimmed" information to counterfeit debit/credit cards, and visit multiple ATM's with a large number of counterfeit debit/credit cards and withdrawal [sic] large amounts of cash.

ROA, Vol. 3 at 3.

26. Base Offense Level: The base offense level for a violation of 18 U.S.C. § 1349 is found in USSG § 2X1.1. According to USSG § 2X1.1(a), the base offense level is based on the base offense level for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty. In this case, the substantive offense is Wire Fraud, 18 U.S.C. § 1343. The base offense level for which is found in USSG § 2B1.1. That section provides that an offense involving theft, fraud or counterfeit instruments base offense level is 7, if the defendant was convicted of an offense referenced to this guideline; and that offense of conviction has a statutory maximum term of imprisonment of 20 or more year [sic]. The defendant in this case is convicted of Conspiracy to Commit Wire Fraud; therefore, the defendant's base offense level is 7. USSG § 2B1.1(a)(1). Additionally, if the offense involved 250 or more victims, increase by 6 levels. USSG § 2B1.1(b)(2)(C). There are a total of 19 financial institutions that are identified as victims in this case in addition to 276 individuals whose accounts were compromised; therefore, 6 levels are added. Additionally, if the loss was more than $200,000 but less than $400,000, 12 levels are added. USSG § 2B1.1(b)(1)(G). The total intended loss in this case has been identified as

11

$360,856.80. Additionally, if the offense involved sophisticated means, increase by 2 levels. USSG §2B1.1(b)(10)(C). As cited in the offense conduct, the defendants would travel from the Seattle, Washington, area to place a debit card skimmer on the inside of gas pumps with the intent to capture the card data and "pin" number. The defendants would retrieve the data from the skimming device and place it on a card through a computer, to withdrawal [sic] money from the victim's [sic] bank accounts at numerous ATMs. Pursuant to USSG § 2B1.1(b)(11)(B), if the offense involved the production of any unauthorized access device, increase by 2 levels. The defendants in this case produced numerous fraudulent debit cards to make withdrawals from various ATMs; therefore, 2 levels are added.

Id. at 15.

Alisuretove argues that "no evidence at the sentencing hearing shows that [he] used or placed skimming devices." Aplt. Br. at 12. Indeed, Alisuretove notes, Agent Coffman conceded at the sentencing hearing that the Secret Service had no evidence that Alisuretove personally handled any of the skimming devices used in this case. Instead, Alisuretove argues, "[a]ll the evidence shows that . . . Konstantinov or an unknown person installed the devices and later collected them." Id. In short, Alisuretove argues, "[i]n the overall scheme, there was a higher level of participants who acquired the skimming devices, installed them, collected them, harvested information from them, and created credit cards from the harvested information." Id. "There was no evidence in this case," he asserts, "that showed that [he] engaged in any of that conduct, or that he even knew about it or knew how the false credit cards were obtained." Id.

12

Alisuretove in turn argues that, "[w]ithout any basis for concluding that [he] was involved with the access devices, the foreseeability analysis is changed dramatically." Id. at 13. According to Alisuretove, he "only participated on certain trips to withdraw money from ATMs, and he did not participate in any activity that placed any skimming devices, whereby he would be accountable for all loss resulting from the use of the device." Id. at 14. More specifically, Alisuretove asserts that "he was in Durant, Oklahoma on November 1, 2012, flew from Dallas/Ft. Worth to Seattle, Washington (his home city) three days later, and used counterfeit cards at ATMs in Oklahoma City on two dates." Id. at 13. Alisuretove also asserts that he withdrew from the conspiracy in January 2013. Thus, he argues, both the PSR and the district court erroneously attributed to him losses that occurred prior to November 2012 and after January 2013.

Lastly, Alisuretove notes that, "[a]fter arrest, [he] told the officers that he was given 10% of the acquired money, and was paid $14,000." Id. at 15. "This," he asserts, "reflected $140,000 of theft." Id. He argues that, "[w]hile the district court was not bound to accept [his] version, relevant conduct does not reflect that he is accountable for more." Id. And, he argues, "[s]ince this amount is under $200,000, the [district court's] error is not harmless."[3] Id.

We conclude, however, that Alisuretove's arguments are belied by the

---

[3] Under U.S.S.G. § 2B1.1(b), a finding of loss more than $120,000 but less than $200,000 results in a 10-level increase in the defendant's base offense level.

13

Sentencing Guidelines, his guilty plea, and by the evidence presented by the government at the time of sentencing. "In calculating loss under the Guidelines, the district court does not limit itself to conduct underlying the offense of conviction, but rather may consider all of the defendant's 'relevant conduct.'" United States v. Griffith, 584 F.3d 1004, 1011 (10th Cir. 2009) (quoting U.S.S.G. § 1B1.3). The Guidelines define "relevant conduct" broadly to include, "in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omission of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. §1B1.3(a)(1)(B). Thus, "[r]elevant conduct under the Guidelines . . . comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct." Griffith, 584 F.3d at 1012 (internal quotation marks omitted).

The conspiracy count of the indictment in this case specifically alleged, and Alisuretove expressly conceded when he pleaded guilty to that count, that the conspiracy began in April 2012. ROA, Vol. 1 at 9; ROA, Vol. 2 at 25. Notably, Alisuretove's admission on that point is supported by Agent Coffman's testimony at the sentencing hearing. According to Coffman, flight and other records indicated that Alisuretove and Konstantinov each traveled to Texas in late April 2012, and likely traveled together, in a vehicle rented by Konstantinov, to

14

Oklahoma and Arkansas in late April and early May 2012. Based upon this evidence, it would have been entirely reasonable for the district court to infer that Konstantinov placed one or more of the skimming devices on gas pumps during that time period. Indeed, the government asserts that "a skimming device was placed at a Murphy's station in Little Rock, Arkansas in May 2012." Aplee. Br. at 4.

To be sure, Agent Coffman conceded that the government lacked any evidence indicating that Alisuretove was directly involved with placing or removing the skimming devices. But the conspiracy count of the indictment alleged that "[i]t was part of the scheme and artifice that the defendants would travel by commercial airline from their residences in Seattle, Washington to Texas, Oklahoma, and Arkansas," where "[t]hey would then rent a vehicle, check in to a hotel, and place the skimming devices on gas pumps." ROA, Vol. 1 at 9. Under the longstanding law of this circuit, Alisuretove's unconditional plea of guilty to that conspiracy count was "an admission of all material facts alleged in the charge." United States v. Brown, 164 F.3d 518, 521 (10th Cir. 1998). Thus, Alisuretove's guilty plea operated as an admission that he was involved with the placement of the skimming devices.

Moreover, even if we were to ignore the effect of Alisuretove's guilty plea, it was still proper for the district court to hold Alisuretove responsible for the placement of the skimming devices. As noted, § 1B1.3(a)(1)(B) of the Sentencing

15

Guidelines "provides that a defendant involved in a joint criminal undertaking may be held responsible for relevant conduct that includes *all reasonably foreseeable* conduct of his co-conspirators that is in furtherance of the conspiracy." United States v. Gordon, 710 F.3d 1124, 1164 (10th Cir. 2013) (internal quotation marks omitted; italics in original). Quite clearly, Alisuretove knew or should have known that Konstantinov or other persons working with Konstantinov[4] were doing something to illegally obtain the debit card information that was ultimately used to make ATM withdrawals. Whether or not Alisuretove specifically knew that Konstantinov or another person was employing skimming devices on gas pumps was irrelevant. Thus, the district court did not err in holding Alisuretove responsible for all skimming devices that were placed by co-conspirators (known or unknown) during the course of the conspiracy, as well as the card information illegally retrieved.

As for Alisuretove's assertion that he withdrew from the conspiracy in January 2013 and should therefore not be held responsible for any losses that occurred after that point, the district court expressly found that there was "insufficient evidence to show that [Alisuretove] terminated his involvement in

---

[4] The conspiracy count of the indictment, to which Alisuretove expressly pleaded guilty, alleged that "[b]eginning in or about April 2012 and continuing until in or about January 2013, . . . KONSTANTINOV and . . . ALISURETOVE, defendants herein, and others known and unknown to the Grand Jury would obtain account information and personal identification numbers . . . by using a skimming device." ROA, Vol. 1 at 9 (emphasis added).

16

the jointly undertaken criminal activity." ROA, Vol. 2 at 70. Notably, Alisuretove does not point to any evidence that would establish that the district court's factual finding on this point was clearly erroneous. Thus, we conclude that the district court did not err in holding Alisuretove responsible for losses that occurred after January 2013.[5]

Lastly, Alisuretove's statements to law enforcement regarding the amount of money he purportedly received as a result of the ATM withdrawals were not binding on the district court in calculating the total loss associated with the offense of conviction. Further, Alisuretove's assertion that the total loss was approximately $140,000 was contrary to the allegations in Count 1 of the indictment, which specifically stated that "a loss amount of approximately $400,000 was incurred." ROA, Vol 1 at 10. As noted, Alisuretove's unconditional plea of guilty to Count 1 was an admission of the amount of loss alleged therein. Brown, 164 F.3d at 521. And, in any event, the evidence presented by the government at the time of sentencing established that the amount

---

[5] The losses that occurred after January 2013 were related to debit account information skimmed from a gas pump in Conway, Arkansas. The account information obtained from the gas pump was used by the conspirators between September 2012 and May 2013. The government's evidence at the sentencing hearing lumped all of those losses together, totaling $90,978.24. In other words, the government's evidence did not detail the amount of loss that occurred between February 2013 and May 2013. Even if all losses associated with the Conway gas pump were excluded from the district court's calculation, the total loss would still exceed $200,000 and would thus support the 12-level enhancement imposed by the district court.

of loss associated with the conspiracy was well above $140,000 (and, in fact, was approximately $360,856.80).[6]

For these reasons, we conclude that the district court did not err in calculating the amount of loss associated with Alisuretove's offense of conviction.

*The restitution amount*

In his second issue on appeal, Alisuretove challenges the amount of restitution that the district court ordered him to pay under the MVRA. "We review the district court's application of the MVRA *de novo*, review its factual findings for clear error, and review the amount of restitution awarded for abuse of discretion." United States v. Gallant, 537 F.3d 1202, 1247 (10th Cir. 2008).

The MVRA requires a district court, in certain types of criminal cases, including those involving "offense[s] against property . . . committed by fraud and deceit," 18 U.S.C. § 3663A(c)(1)(A)(ii), to "order . . . that the defendant make restitution to the victim of the offense," id. § 3663A(a)(1). This statutory reference to "offense" obviously refers to the defendant's "offense of conviction." Griffith, 584 F.3d at 1019; see Hughey v. United States, 495 U.S. 411, 416 (1990)

---

[6] It is important to note, as we explain in greater detail in our discussion of Alisuretove's challenge to the amount of restitution awarded by the district court, that the amount of loss for purposes of the Sentencing Guidelines, which incorporates all of the conduct involved with the conspiracy or scheme, is different from the amount of restitution that can be awarded under the MVRA for the offense of conviction.

18

(interpreting similar wording employed under restitution provision of the Victim and Witness Protection Act). "The government bears the burden of proving the amount of loss [under the MVRA] by a preponderance of the evidence." Gallant, 537 F.3d at 1247.

Alisuretove argues that the district court, in determining the amount of restitution owed under the MVRA, erroneously took into account losses incurred by twelve financial institutions, even though Count 1 of the indictment listed only five specific financial institutions that were targets of the conspiracy.

To address this argument, we begin by examining the relevant language of the indictment. Count 1 described the "OBJECTS OF THE CONSPIRACY" in the following manner:

> Wire Fraud - KEVIN KONSTANTINOV, ELVIN ALISURETOVE, and others known and unknown to the Grand Jury, did knowingly transmit or cause to be transmitted funds from Arvest Bank, Oklahoma, First United Bank of Durant, Oklahoma, First Texoma National Bank of Durant, Oklahoma, Landmark Bank of Durant, Oklahoma, and Shamrock Bank of Durant, Oklahoma by means of a wire in interstate commerce, communications, to obtain money by false or fraudulent pretenses.

ROA, Vol. 1 at 8. In other words, Count 1 essentially alleged that the conspiracy had five objects: to obtain, by false or fraudulent pretenses (the use of fraudulent debit cards) money from each of the five listed financial institutions by means of a wire in interstate commerce. Although it is apparent from the record that the defendants intended to, and in fact did, fraudulently obtain money from other

19

financial institutions as well, the scope of the conspiracy encompassed by Alisuretove's guilty plea was expressly limited to the five financial institutions listed in the "OBJECTS" section of Count 1of the indictment.[7]

Notably, however, the MVRA defines the term "victim" to "mean[] a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered <u>including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern</u>." 18 U.S.C. § 3663A(a)(2) (emphasis added). Quite clearly, this language does not limit the term "victim" to any person or entity specifically listed in the charging document. <u>See</u> <u>United States v. Dickerson</u>, 370 F.3d 1330, 1339 (11th Cir. 2004) ("[T]he courts have held that restitution may be ordered to a victim not named in the indictment, provided that the victim was directly harmed by the defendant's criminal conduct in the course of a scheme or conspiracy.") (internal quotation marks omitted). Rather, this

---

[7] We note that the "OVERT ACTS" section of Count 1 describes a conspiracy much greater in scope than the one described in the "OBJECTS" section of Count 1. In particular, the "OVERT ACTS" section outlines actions that Konstantinov and Alisuretove took between April 2012 and January 2013, including placing skimming devices, and utilizing information obtained therefrom, at locations other than Durant, Oklahoma. The district court appropriately took into account all of this relevant conduct in calculating the amount of loss under the Sentencing Guidelines. For purposes of restitution under the MVRA, however, the district court is limited to the narrower conspiracy described in the "OBJECTS" section of Count 1.

20

language makes clear that where, as here, the offense of conviction involves a scheme or conspiracy, the term "victim" encompasses "any person directly harmed by the defendant's criminal conduct in the course of the scheme [or] conspiracy." 18 U.S.C. § 3663A(a)(2).

It is certainly conceivable that Alisuretove, in the course of carrying out the conspiracy to which he pleaded guilty, directly harmed other financial institutions in addition to the five that were the specific targets of the conspiracy. For example, if the skimming devices that were employed by Alisuretove and Konstantinov to defraud the five target financial institutions were also used to defraud other financial institutions (i.e., by collecting debit card account information that was ultimately used at ATMs of other financial institutions), that would appear to be a "direct harm" that resulted from the defendant's criminal conduct in the course of the conspiracy.

The problem, however, is that neither the PSR nor the district court made any factual findings in this regard. Instead, the PSR and the district court effectively treated the offense of conviction as a general wire fraud conspiracy that was unlimited in scope. Thus, the PSR and the district court took into account all financial institutions that suffered losses as a result of the defendants' general criminal activity, and they did not attempt to link the losses suffered by each financial institution to a particular skimming device or gas pump. As a result, it is impossible to determine from the record on appeal whether these

21

seven additional financial institutions were directly and proximately harmed by the wire fraud committed on the five financial institutions listed in the indictment. Consequently, it is necessary to remand this matter to the district court for resentencing so that it may consider again the proper amount of restitution to be awarded under the MVRA.

Alisuretove also argues that the district court failed to limit the losses incurred to the temporal period of the conspiracy specified in Count 1 of the indictment, i.e., April 2012 to January 2013. As we have noted, "restitution orders under the MVRA [are] limited to 'losses caused by the offense of conviction.'" Griffith, 584 F.3d at 1019. This necessarily includes the temporal limits of the offense as outlined in the indictment. United States v. DeLeon, 728 F.3d 500, 507 (5th Cir. 2013) ("Restitution is limited to the loss actually caused by the offense of conviction, the time span of which is defined by the 'specific temporal scope' of the indictment. Thus, restitution cannot be awarded for 'losses' attributable to conduct outside the temporal scope of the scheme charged; the same is true for conduct not charged as part of the scheme."); see Griffith, 584 F.3d at 1022 (concluding that a particular act of misappropriation did not occur during the period of the offense of conviction, and thus could not be considered for purposes of restitution under the MVRA). In other words, only losses that are tied to criminal acts occurring during the temporal scope of the charged offense are recoverable under the MVRA.

22

To the extent that Alisuretove is arguing that a victim's financial loss must also be incurred during the temporal limits outlined in the indictment, we disagree. It is conceivable that certain types of criminal conduct could result in delayed or continuing financial losses to the victim. Nothing in the plain language of the MVRA suggests that such losses would not be recoverable. Rather, as we have noted, the temporal limitations imposed by the MVRA are linked to the "offense" at issue, i.e., the criminal conduct.

In this case, Count 1 of the indictment alleged that the conspiracy lasted from "[i]n or about April, 2012 to in or about January 2013." ROA, Vol. 1 at 8. The PSR, however, made reference to debit card account "compromises" extending through "May 7, 2013." ROA, Vol. 3 at 12. More specifically, paragraph 17 of the PSR grouped the losses by the three known locations where the defendants "skimmed" account information: Little Rock, Arkansas; Conway; Arkansas; and Durant, Oklahoma.[8] ROA, Vol. 3 at 12-13. And, with respect to the account information "skimmed" in Conway, Arkansas, paragraph 17 stated as follows:

---

[8] The five financial institutions that were the express objects of the conspiracy, as alleged in Count 1 of the indictment, were all based in Durant, Oklahoma. From what we can gather from the record, it was the defendants' acts of "skimming" information from a gas pump in Durant that resulted in losses to these five institutions. Consequently, we question whether the account information "skimmed" by the defendants in Conway and Little Rock, Arkansas, can be considered for purposes of restitution under the MVRA. That is a matter that must be resolved by the district court on remand.

23

### (2) Conway, AR Compromises - September 4, 2012 - May 7, 2013

> 252 Accounts Compromised
> 231 Fraudulent withdrawals
> Total Financial Institution Loss-$90,978.24
> Fraud Locations - Arkansas, California, Illinois, Oklahoma,
> Washington, Overseas Locations

Id. at 12. The heading of subparagraph 2 is the only reference in the record to events or losses occurring after January 2013.[9] As a result, it is unclear whether the "compromises" referred to in paragraph 17 of the PSR included criminal acts committed by the defendants after January 2013 and extending through early May 2013. It is therefore impossible for us to determine whether the losses listed in the PSR and ultimately relied on by the district court were, from a temporal perspective, properly considered in calculating the amount of restitution under the MVRA.

On remand, the district court must be careful to take into account not only the objects of the charged conspiracy, but also its temporal limits, in calculating the amount of restitution owed by Alisuretove under the MVRA.

### III

We AFFIRM the district court's calculation, for purposes of U.S.S.G. §2B1.1(b)(1), of the total amount of loss associated with Alisuretove's conspiracy

---

[9] Agent Coffman, during his testimony at the sentencing hearing, made references to, but did not explain the basis for, the figures outlined in paragraph 17 of the PSR. ROA, Vol. 2 at 53, 62-63.

conviction. We REVERSE the district court's calculation of the amount of restitution owed by Alisuretove under the MVRA and REMAND the case for resentencing on that issue.

No. 14-7050, *United States v. Alisuretove*

**GORSUCH**, Circuit Judge, concurring in the judgment.

The path I've followed in deciding this case could be fairly accused of being exceedingly narrow and maybe even mundane. But I believe it's sufficient to the day's work all the same.

When it comes to Mr. Alisuretove's prison sentence, I wouldn't pass on the question what losses are and aren't properly attributable to him. Even subtracting everything he says shouldn't be counted, Mr. Alisuretove is still responsible for over $200,000 in losses and finds himself facing the same 12-level offense enhancement the district court applied. So even assuming (without granting) the district court erred in its loss calculations, nothing changes. *See* U.S.S.G. § 2B1.1(b)(1)(G).

When it comes to the restitution award, I wouldn't express a view on how far a district court may or may not go in requiring a defendant to repay losses arising after the conspiracy's end for again I stumble over an even more basic problem. The materials before us contain only a probation officer's list of banks and amounts, without any accompanying factual findings from the district court attempting to link the listed banks and their putative losses to Mr. Alisuretove or his conduct. Sufficient factual findings along these lines may well be possible, indeed they might be quickly supplied on remand, but I just don't see any way to

question their necessity under the statute and our existing precedent.  *See* 18 U.S.C. § 3663A(a)(2); *United States v. Reano*, 298 F.3d 1208, 1210-11 (10th Cir. 2002) ("The district court must support its restitution order with findings of fact in the record." (internal quotation marks omitted)).  No doubt the court and parties rightly focused most of their attention at the sentencing hearing in this case on the task of ensuring a fair prison term.  But when restitution is part of the sentencing equation a district court and the parties must ensure this portion of the defendant's sentence is individualized and considered too, not mechanically applied based on no more than a cryptic and unexplained note from a probation officer.  *See United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014).

With that much said — as little as it admittedly is — this appeal may be to my mind fully resolved.