RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0248p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROGER LEE ANDREWS,

*Defendant-Appellant.*

No. 14-2045

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cr-00178—Robert J. Jonker, District Judge.

Decided and Filed: October 16, 2015

Before: BOGGS, SUTTON, and STRANCH, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Gregory C. Sassé, Cleveland, Ohio, for Appellant. Christopher M. O'Connor, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

_____

### OPINION

_____

SUTTON, Circuit Judge. Roger Lee Andrews borrowed a lot of money from several people, claiming the money would go to improve several properties and that he would pay it back quickly with substantial interest. Neither happened. He never returned the money or for that matter paid any interest. And the properties were a mirage. The money instead went into a personal day-trading account—and never reappeared. A jury convicted him of one count of wire fraud. We affirm.

From 2006 to 2008, Andrews asked various friends and colleagues to loan him money—roughly two million dollars in total.  When he asked for a loan, Andrews usually gave a reason.  He said he needed money to purchase property in Indianapolis or to improve property that he owned in the area.  On occasion Andrews used other pretenses.  All told, as Andrews admits, there were seventeen instances in which he borrowed money on such grounds.  For the most part, as one lender put it, "[i]t was always about" property in "Indianapolis."  R. 82 at 65.

Except it was not.  Unbeknownst to the lenders, Andrews never owned, bought, or improved property in Indianapolis.  Andrews instead mostly used the money to fund a day-trading account with TD Ameritrade.  Any skill Andrews had in convincing others to loan him money did not translate into skill as an investor.  Andrews was invariably buying when he should have been selling and selling when he should have been buying.  Most of the money vanished.

Sometimes Andrews paid the loans back, especially early in the scheme.  But most of the time he did not, especially as time went on.  When Andrews borrowed money that he could not repay on time, he continued to tell tales about the Indianapolis property to assure his victims that their loans would eventually be returned, though "it was going to take a little bit of time."  R. 82 at 51–55.  Andrews's assurances that the Indianapolis property existed and that the money was being used for purposes related to it continued well after the last loan occurred—at least into 2010.  All in all, Andrews's victims lost over 1.4 million dollars.

A grand jury indicted Andrews on one count of wire fraud, *see* 18 U.S.C. § 1343, and a jury convicted him.  The court sentenced him to 87 months in prison and ordered him to repay the full amount his victims had lost.  On appeal, Andrews presses two related issues:  Were all of these incidents part of a single "scheme to defraud" under § 1343?  And was the indictment time barred?

*Scheme to defraud?*  All of the loans that Andrews obtained to fund his day-trading account were part of a single "scheme . . . to defraud."  18 U.S.C. § 1343.  "A scheme to defraud," we have explained, "includes any plan or course of action by which someone intends to deprive another . . . by deception of money or property by means of false or fraudulent pretenses, representations, or promises."  *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003).  The existence of a scheme to defraud and its duration are fact questions for the jury.

*United States v. Cunningham*, 679 F.3d 355, 374 (6th Cir. 2012). Consistent with the text of the statute and our caselaw, the district court instructed the jury that "[a] 'scheme to defraud' includes any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." R. 84 at 206.

Ample evidence supported the resulting conviction—and most pertinently the necessary finding that the scheme included all of the fraudulently obtained loans, including those that occurred as early as 2006. Several pieces of evidence united the loans into one scheme to defraud: (1) a common false statement of a need for funds, usually related to nonexistent Indianapolis property; (2) a common group of victims, usually friends or colleagues, who loaned money to Andrews repeatedly; and (3) a common purpose for the funds, usually the need to fund Andrews's day-trading account. Five witnesses confirmed the common false statement of need for the funds—that Andrews claimed he needed money in connection with property in Indiana. The four victims had similar relationships with Andrews: Two were friends and business associates; one considered Andrews his "[b]est friend[]," R. 84 at 7; and one had a business relationship with Andrews. And Andrews used most of the money in the same way—to fund his day trading. Altogether, this evidence readily fits within our understanding of a "scheme to defraud." *See United States v. Kennedy*, 714 F.3d 951, 957–59 (6th Cir. 2013); *Cunningham*, 679 F.3d at 370–71.

No doubt in some cases each individual fraudulent act (here each individual loan) is treated as a single "scheme to defraud," and each act is charged as a stand-alone violation of § 1343. *See, e.g., United States v. Nixon*, 694 F.3d 623, 627 (6th Cir. 2012) (upholding conviction of eleven counts of wire fraud, all stemming from the defendant's misuse and theft of her employer's resources); *United States v. Stafford*, 639 F.3d 270, 273 (6th Cir. 2011) (upholding conviction of fifty-one counts of fraud, money laundering, and conspiracy to commit fraud, all stemming from a fraudulent home-buying scheme). But that reality does not prevent the government from charging, and from proving, that a series of fraudulent acts constitutes a single "scheme to defraud." *United States v. Fishman*, 645 F.3d 1175 (10th Cir. 2011), illustrates the point. Fishman and his co-conspirators concocted a complex scheme involving the sale of fraudulent bonds. *Id.* at 1180–82. The scheme lasted over 5 years, impacted 250 victims,

and resulted in a loss of over 4 million dollars. *Id.* at 1182. Fishman and his co-conspirators engaged in individual sales with each investor and employed different "stalling tactics" when investors became concerned about what happened to their investments. *Id.* at 1181. The Tenth Circuit had no trouble upholding Fishman's conviction for conspiracy to commit wire fraud and treating the multiple sales over five years as one "scheme to defraud" under § 1343. *Id.* at 1186–87. We have no trouble taking a similar path here.

*Time bar?* Andrews also was indicted within the five-year statute of limitations. *See* 18 U.S.C. § 3282(a). As the record confirms and as Andrews concedes, the final loan occurred on September 25, 2008. That is fewer than five years before the government indicted Andrews—on September 18, 2013. As noted, "the duration of the scheme to defraud" is a fact question, *Cunningham*, 679 F.3d at 374, and the court properly instructed the jury to determine whether "at least one wire communication was used on or after September 18, 2008," R. 84 at 207. As the above evidence shows, the jury permissibly found each element. Indeed, even if the jury had decided that the scheme ended when Andrews received the last loan, the *entire* scheme faces no statute-of-limitations problem because the last loan occurred within five years of the indictment. *See Daniel*, 329 F.3d at 489. In the final analysis, considerable evidence supports the government's theory that Andrews's series of false statements and illegally obtained loans constituted a single "scheme to defraud," *see* R. 84 at 206, one that ended fewer than five years before his indictment.

Andrews's contrary arguments do not do the trick. He claims that "[e]ach fraudulently induced loan was its own scheme" that ended when he received the loan, Appellant's Br. 32, and that his prosecution for any loans received prior to September 2008 thus should be time barred. But the jury concluded otherwise, and sufficient evidence supports its finding, as we have explained. Andrews's understanding of "scheme to defraud," moreover, is not ours—and more particularly it is not the one reflected in our caselaw. Several common acts in support of a common fraudulent design may create a scheme to defraud, as opposed to isolated acts of fraud. *See Kennedy*, 714 F.3d at 957–59; *Cunningham*, 679 F.3d at 370–71.

At various points in his initial brief, Andrews seems to challenge his indictment as duplicitous. But as Andrews later acknowledges, he made no such challenge below and does not

mean to raise such a challenge now.  His argument instead turns on the statute of limitations, a contention we have already considered and rejected.

*United States v. Anderson*, 188 F.3d 886 (7th Cir. 1999), does him no good.  In that case, the Seventh Circuit held that the scheme "was completed upon receipt of the funds" and that "[t]he mere act of transferring money from one bank account to another was not part of the original scheme to defraud, nor did it create a new financial risk." *Id.* at 891.  That setting is not this one.  Having received money on false pretenses, Andrews did not place it in a bank account and leave it there.  He put it in a trading account, continuing to invest it and continuing to expose it to new financial risks, as each victim can attest.  The fraud did not end when he obtained the loans from his victims.  What is more, Andrews continued to assure his victims that the money he had taken from them was still being used to buy or improve the Indianapolis property long after he had obtained the money.  Such actions have a "lulling effect" on the victims, making the actions part of the ongoing fraud.  *United States v. Faulkenberry*, 614 F.3d 573, 582–83 (6th Cir. 2010); *see United States v. Lane*, 474 U.S. 438, 451–52 (1986).  All of these actions came within the "scheme to defraud" and indeed were part and parcel of it.  The statute of limitations did not bar the government's prosecution of the whole scheme.

For these reasons, we affirm.