RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0229p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

Nos. 18-5158/5316/5332

*v.*

MONIQUE ANNETTE ELLIS,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:16-cr-00236-1—Gershwin A. Drain, District Judge.

Argued: December 7, 2018

Decided and Filed: September 6, 2019

Before: NORRIS, STRANCH, and LARSEN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael C. Holley, FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Mark S. Determan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Michael C. Holley, Ronald C. Small, FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Mark S. Determan, S. Robert Lyons, Joseph B. Syverson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

LARSEN, J., delivered the opinion of the court in which NORRIS and STRANCH, JJ., joined. STRANCH, J. (pp. 12–13), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

LARSEN, Circuit Judge.   Over the course of more than four years, Monique Ellis submitted hundreds of false tax returns to the IRS using stolen identities, and she received hundreds of thousands of dollars in fraudulent refunds.   When the IRS caught on to Ellis's scheme, she was indicted on eight counts of wire fraud and eight counts of aggravated identity theft.   A jury convicted her on all counts.   On appeal, Ellis challenges: (1) the district court's denial of her motion to dismiss the indictment; (2) the amount of loss the district court attributed to her for sentencing purposes; (3) the district court's calculation of the amount she owed in restitution; and (4) the ability of the district court to order restitution for conduct that occurred more than five years before the grand jury returned the indictment.   But neither the law nor the facts support overturning the district court in any regard.   We thus AFFIRM the district court's judgment.

I.

In 2012, the IRS began to suspect that Monique Ellis was filing fraudulent tax returns.   In June 2012, the IRS searched Ellis's apartment in Antioch, Tennessee.   Inside the apartment, agents found personal identifying information—such as names, dates of birth, and social security numbers—handwritten inside notebooks, on printouts from the Alabama Department of Corrections' database, and in a TurboTax database on laptops seized from Ellis's bedroom.   All told, agents found the personal identifying information for more than 400 people inside Ellis's apartment.   Agents seized two laptops found in Ellis's bedroom; a forensic review of the computers revealed that they had been used to file hundreds of electronic tax returns from 2008 through 2012.

Four years later, in November 2016, the government sought to indict Ellis.   The indictment alleged that Ellis had devised a scheme to submit fraudulent tax returns "[b]eginning no later than in or about January 2012 and continuing through at least in or about February 2012."   The indictment charged Ellis with:  (1) eight counts of wire fraud for submitting false tax

returns using Alabama inmates' identities in January 2012, in violation of 18 U.S.C. § 1343; and (2) eight corresponding counts of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), (c)(5) and 18 U.S.C. § 2. IRS Special Agent Jason Ward testified before the grand jury, which ultimately returned the indictment on all counts. After the government admitted that some of Agent Ward's statements had been wrong, Ellis moved to dismiss the indictment.[1] The district court denied the motion, finding that "Special Agent Ward's inaccurate statements did not have a substantial influence on the grand jury's decision to indict because of the overwhelming other evidence he presented to the grand jury." Ellis went to trial, and the jury convicted her on all counts.

Ellis was sentenced in January 2018. At sentencing, Agent Ward testified that the intended loss from Ellis's scheme was approximately $700,000. This figure included the total amount requested as refunds, not just the amount actually refunded. The district court agreed with the $700,000 calculation. This triggered a fourteen-step increase in offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(H), which applies to intended losses between $550,000 and $1,500,000. The resulting Guidelines range for the wire fraud counts was 51 to 71 months. The district court departed downward and imposed a 48-month sentence for wire fraud and a consecutive, mandatory, 24-month sentence for aggravated identity theft, for a total of 72 months, followed by three years of supervised release.

In March 2018, the district court held a separate hearing to determine the appropriate forfeiture and restitution amounts. The district court ordered forfeiture of $11,670, which was the total of the eight tax returns for which Ellis had been indicted and convicted; Ellis did not object. The government asked the district court to order approximately $350,000 in restitution as well. Ellis objected and argued that the government had not presented evidence that all of the refunds used to calculate that amount were part of the same scheme; she also argued that some of that amount was tied to conduct that occurred outside of the statute of limitations. The district

---

[1]Agent Ward testified that one of the laptops seized contained Ellis's bank records and PDF copies of several tax returns that were the subject of the indictment. But that was incorrect; the IRS had not found bank records or PDFs of any tax returns on the laptop. The referenced documents were, instead, obtained through subpoenas. The district court noted that Agent Ward appeared to have simply made a mistake. Agent Ward testified that he inherited the case from another case agent, who placed the tax returns and bank statements in a folder labeled "Search Warrant Files," leading Ward to believe that those materials came from the seized laptop.

court overruled Ellis's objections and imposed the government's requested amount, $352,183.20, in restitution to the United States, Georgia, and Mississippi, for their respective losses.  Ellis now appeals.

## II.

In her opening brief, Ellis argues that the district court had abused its discretion by denying her motion to dismiss the indictment based on Agent Ward's inaccurate testimony.  In response, the government cites *United States v. Cobleigh*, which—relying on the Supreme Court's decision in *United States v. Mechanik*, 475 U.S. 66 (1986)—declined to consider the merits of a claim of perjury before the grand jury, holding that appellant's subsequent conviction rendered any such error harmless.  75 F.3d 242, 251 (6th Cir. 1996); *see also United States v. Combs*, 369 F.3d 925, 936 (6th Cir. 2004) ("[A]ny indictment defect generated by alleged perjured testimony was cured by the jury's verdict that Combs was guilty of this offense.").  Ellis now concedes that *Cobleigh* controls and that she cannot prevail on her argument here.  Because we are bound by *Cobleigh* and *Combs*, Ellis's claim fails.

## III.

Ellis next argues that the district court erred in finding that she was responsible for an intended loss of more than $550,000—a finding that affected her Guidelines range.  "Because of the difficulties often associated with attempting to calculate loss in a fraud case, the district court need only make a reasonable estimate of the loss using a preponderance of the evidence standard."  *United States v. Wendlandt*, 714 F.3d 388, 393 (6th Cir. 2013) (citation and internal quotation marks omitted).  And the "district court's findings are not to be overturned unless they are clearly erroneous."  *United States v. Rothwell*, 387 F.3d 579, 582 (6th Cir. 2004).  A district court's factual determination is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction" that the district court made a mistake.  *United States v. Vasquez*, 352 F.3d 1067, 1070 (6th Cir. 2003).

At sentencing, Agent Ward testified that Ellis was responsible for a loss of approximately $700,000.  He calculated the loss using:  (1) the dollar amount of tax refunds deposited into bank

accounts belonging to Ellis or her children ($130,101);**2** and (2) the total dollar amount of refund requests filed with TurboTax software that matched the unique identifier numbers (UIDs) found in the browser history of the laptops seized from Ellis's bedroom ($570,892). The loss calculation, thus, included the total amount Ellis had requested in refunds, not just what she received. *See* U.S.S.G. § 2B1.1, cmt. n.3(A). Agent Ward clarified that he had taken measures to avoid counting the same return twice. For example, if a return was filed using the TurboTax software and a refund corresponding to that return was later deposited into one of Ellis's bank accounts, he removed that amount from the TurboTax calculation, meaning he counted it only in the deposit category.

The district court agreed with Agent Ward's calculation, finding that Ellis's intended loss was over $700,000. That loss amount resulted in a fourteen-level increase in offense level under U.S.S.G. § 2B1.1(b)(1)(H), which applies to an intended loss of between $550,000 and $1,500,000. Ellis argues that the district court erred by holding her responsible for returns that might have been filed without her aid or that were the product of valid claims. Specifically, Ellis finds error in the district court's findings: (1) that Ellis was involved in filing all tax returns associated with the TurboTax UIDs found on the laptops; and (2) that all tax refund payments made to Ellis-controlled bank accounts from 2008 through 2012 were fraudulent. We address each argument in turn.

## A.

Significant record evidence supported the district court's conclusion that Ellis was involved in filing all the tax returns associated with the UIDs found on the laptops. The UIDs that Agent Ward used for his calculation were found in the browser history on the laptops, and the laptops were found in Ellis's bedroom. These laptops had been used to file over 300 tax returns, and there was no indication another adult lived in the apartment. In addition, agents found personal identifying information for more than 400 people in Ellis's apartment. And many

---

**2**In addition to bank accounts in her own name, Ellis had tax refunds deposited into accounts for Dominique Walker, Tilsa Walker/Monique Burton, and Jamarrios Fluker. Dominique Walker, Tilsa Walker, and Jammarrios Fluker are all Ellis's children. Dominique is developmentally disabled and does not have the capacity to open a bank account. And as of February 2012, Jammarios was nineteen years old and Tilsa was eighteen years old. Finally, "Monique Burton" is Ellis herself; "Burton" was a name from a previous marriage.

of the names and social security numbers of the people on the TurboTax accounts matched the personal identifying information found in Ellis's apartment.  There was also evidence that Ellis was using the laptops and not, for example, merely storing them—the laptops had accessed the internet provider (IP) address associated with Ellis's apartment over 300 times.  Lastly, the tax returns linked to the laptops shared certain characteristics, such as being filed from one of several IP addresses, including the IP address for Ellis's apartment.  This evidence was sufficient for the district court to conclude that Ellis was involved in filing the returns.

But Ellis posits that other people—such as her one-time boyfriend, Seneca Shine, and unknown persons including a "Montize Shine" and a "Thomas Shine"—could have created the UIDs and filed the fraudulent tax returns without her involvement.  She argues that an envelope found in her apartment, containing names and social security numbers on slips of paper, addressed to a "Shine" at a location in Montgomery, Alabama, implicates Seneca Shine.  But Agent Ward testified that no IP addresses from the fraudulent returns were associated with Seneca Shine's home, no personal identifying information was found in his home, and no tax refunds were deposited into his bank accounts.  While Ellis also claims that two of the UIDs were associated with Montize Shine and Thomas Shine, she provides no record citations in support.  Ellis argues that the user names associated with one of the laptops—"Da Realest Stud" and "Randy"—suggest that a man regularly used it.  But nothing prevented Ellis from making these user names herself.  Finally, Ellis argues that patterns from the UID exhibit suggest that: (1) the scheme in tax year 2008 was much different than the scheme in tax year 2011; and (2) during the tax years 2009 through 2011, multiple people may have been using the same UIDs or independently creating different UIDs for the same claimant.  But even if patterns from the UIDs suggested that the scheme changed from year to year, that pattern is consistent with Ellis herself modifying the scheme.  And again, even if other people participated, that would not negate the substantial evidence implicating Ellis herself.

B.

Substantial evidence in the record also supports the district court's conclusion that the refunds actually deposited to bank accounts controlled by Ellis were fraudulent.[3]  First, the evidence that showed Ellis was involved in filing the tax refunds associated with the UIDs found on the laptops also supports the conclusion that the refunds deposited into Ellis-controlled bank accounts were fraudulent—as noted above, for example, agents found the stolen personal identification for more than 400 people inside Ellis's apartment.

Bank records revealed that, from 2008 onward, approximately 120 tax refunds totaling over $130,000 were deposited into accounts Ellis controlled.  Ellis argues that at least one of those refunds was issued to Ellis herself.  But the government clarified that refunds issued in Ellis's name had not been included in the loss for sentencing purposes.  Ellis also claims that, as the refunds frequently failed to state for whom they were issued, they could have been for friends or family who filed valid claims.  But Ellis was, at no point, a registered tax preparer; nor does she explain why so many people would have asked her to prepare their taxes and then have their returns deposited into Ellis's accounts.  Considering the evidence against her, we cannot say that we are left with a definite and firm conviction that the district court made a mistake.

Finally, even if we were to credit Ellis's argument regarding the refunds made to her bank accounts, it would not make a difference to her sentence.  The district court found that Ellis was responsible for an intended loss of more than $700,000, which triggered the fourteen-level increase applicable to intended losses of more than $550,000.  *See* U.S.S.G. § 2B1.1(b)(1)(H). To affect her Guidelines calculation, therefore, Ellis would need to show that the district court clearly erred in attributing at least $150,000 to her.  But Agent Ward clarified that only $130,000 of the $700,000 amount came from the tax refunds deposited into Ellis's various bank accounts; discounting this amount entirely would not bring her below the $550,000 threshold.

---

[3]Ellis does not dispute that she was involved in filing these tax returns or that she controlled the accounts at issue; nor does she dispute the amounts deposited.

IV.

Our conclusion upholding the district court's intended loss calculation for purposes of calculating Ellis's Guidelines range forecloses Ellis's argument that the district court erred in calculating the amount of restitution ($352,183.20) owed to the United States, Georgia, and Mississippi. Ellis rightly notes that restitution may be awarded only for the loss caused by the defendant's crime, but her argument in this respect simply replicates her claim that the district court clearly erred in calculating loss for Guidelines purposes. For the same reasons discussed above, the district court did not abuse its discretion, *see United States v. Boring*, 557 F.3d 707, 713 (6th Cir. 2009), in imposing the amount of restitution. Because Ellis makes no new arguments in support of this position, we need not examine it further.

V.

Ellis lastly argues that the district court erred in ordering restitution for any fraud predating November 2011. The district court's restitution calculation was based on evidence of fraudulent returns filed as part of a scheme lasting from 2008 through 2012. But the grand jury did not indict Ellis until November 2016. Ellis argues that the five-year statute of limitations, *see* 18 U.S.C. § 3282(a), precludes an award of restitution for any fraudulent tax returns submitted before November 2011. We analyze whether the law allows restitution de novo. *Boring*, 557 F.3d at 713.

At this point, we take a step back to examine the statute under which Ellis was ordered to pay restitution. All parties agree that the Mandatory Victims Restitution Act of 1996 (MVRA) applies here. Pursuant to the MVRA, "the court shall order . . . that the defendant make restitution to the victim of the offense . . . ." 18 U.S.C. § 3663A(a)(1). The MVRA defines "victim" as "a person directly and proximately harmed as a result of a commission of [a qualifying] offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* § 3663A(a)(2). The statute defining wire fraud, Ellis's crime, includes "any scheme or artifice to defraud" as an

element. *Id.* § 1343. Finally, the MVRA requires that the court order restitution "to each victim in the full amount of each victim's losses." *Id.* § 3664(f)(1)(A).

So, the MVRA mandates restitution "in the full amount of each victim's losses," where victim is defined as "any person directly harmed . . . in the course of the scheme" without specifying a time limit. Ellis argues that the statute of limitations set forth in 18 U.S.C. § 3282 sets a time limit on restitution pursuant to the MVRA. She notes that § 3282(a) states that "no person shall be prosecuted, tried, or *punished* for any offense" (emphasis added) unless an indictment is returned within five years of the offense; she further observes that this circuit has held that restitution ordered pursuant to the MVRA is punishment. *See, e.g., United States v. Schulte*, 264 F.3d 656, 661–62 (6th Cir. 2001).

Of course, there can be no statute of limitations problem if, as the government argues, the statute of limitations had not run. "[N]ormally the date of the last overt act in furtherance of the conspiracy alleged in the indictment begins the clock for purposes of the five-year statute of limitations." *United States v. Smith*, 197 F.3d 225, 228 (6th Cir. 1999). In *United States v. Andrews*, we applied this principle in the context of a scheme to obtain loans through wire fraud. 803 F.3d 823, 825–26 (6th Cir. 2015). Rejecting the defendant's argument that the indictment was time barred, we held that even if some of the fraudulent loans had been procured more than five years before the indictment was returned, "the *entire* scheme faces no statute-of-limitations problem because the last loan occurred within five years of the indictment." *Id.*

Relying on *Andrews*, the government argues that because at least some of the fraudulent tax returns in this case were filed after November 2011, Ellis may properly be ordered to pay restitution for the whole scheme. In line with *Andrews,* Ellis's counsel conceded at oral argument that, had the government sought to indict Ellis for her earlier conduct, the statute of limitations would have posed no obstacle to imposing criminal liability for acts predating November 2011. Yet counsel continued to argue that the statute of limitations precluded restitution for any fraudulent tax refunds Ellis received prior to November 2011. How can this claim be reconciled with that concession? The MVRA, after all, requires "restitution . . . for all losses attributable to [the defendant]'s scheme to defraud." *United States v. Jewitt*, 978 F.2d

248, 252 (6th Cir. 1992); *see also United States v. Carpenter*, 359 F. App'x 553, 559 (6th Cir. 2009) (same).

Counsel attempted to make sense of it by arguing that the statute of limitations treats restitution differently than underlying criminal liability. But we see nothing in the relevant statute of limitations, 18 U.S.C. § 3282(a), that would support such a distinction. To the contrary, the statute, which states that "no person shall be prosecuted, tried, or punished for any offense" unless an indictment is returned within five years of the offense, seems to treat prosecution, trial, and punishment (here, restitution) equally.

Ellis argues that the Supreme Court's decision in *Kokesh v. SEC*, 137 S. Ct. 1635, 1641 (2017), supports her claim. But *Kokesh* answered an altogether different question under a different statute of limitations. *Kokesh* construed 28 U.S.C. § 2462, the "general statute of limitations for civil penalty actions," *Gabelli v. SEC*, 568 U.S. 442, 444 (2013). Section 2462 states:

> an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years *from the date when the claim first accrued* . . . .

(Emphasis added). The only question in *Kokesh* was whether disgorgement constituted a "penalty" for purposes of the statute. *Kokesh*, 137 S. Ct. at 1639. The Supreme Court concluded that it did, "and so disgorgement actions must be commenced within five years of the date the claim accrues." *Id.* Applying that principle meant that, although Kokesh had misappropriated $34.9 million from his clients over more than ten years, he could be required to disgorge only $5 million because $29.9 million "resulted from violations outside the limitations period." *Id.* at 1641. But the principle that limited the recovery of the earlier penalties in *Kokesh* derived from the language of the statute at issue there, which measured the limitations period "from the date when the claim first accrued," 28 U.S.C. § 2462, and, in that context, meant the date when the fraud occurred. *See Gabelli*, 568 U.S. at 448.

*Kokesh*, accordingly, has no bearing on the statute of limitations applicable to Ellis's case, 18 U.S.C. § 3282, or its relationship with the MVRA. *Kokesh*, therefore, is no help to Ellis. Ellis concedes that under *Andrews*, which construed § 3282, the government could prosecute her

for fraudulent returns filed before November 2011, so long as at least one fraudulent return in the "scheme" was filed after that date.  As explained above, the language of the statute treats prosecution, trial, and punishment equally.  And, except for her reliance on *Kokesh*, Ellis does not explain why § 3282 would cabin the amount of restitution she could be ordered to pay to no earlier than November 2011.

\* \* \*

None of Ellis's arguments persuade.  We thus AFFIRM the district court's judgment.

---

**CONCURRENCE**

---

JANE B. STRANCH, Circuit Judge, concurring.  I join the majority opinion but write separately to express my serious concern about the language used by the Government in Ellis's indictment to define the scope of her fraudulent scheme.

Under the MVRA, courts may order restitution only for losses suffered by victims of "the precise scheme that was an element of the defendant's convicted offense."  *United States v. Jones*, 641 F.3d 706, 714 (6th Cir. 2011).  And where, as here, "a defendant is convicted by a jury . . .  the scope of the scheme is defined by the indictment for purposes of restitution."  *Id.*  The government therefore "bears the burden" of making an indictment's "language sufficient to cover all acts for which it will seek restitution."  *United States v. Akande*, 200 F.3d 136, 142 (3d Cir. 1999) (quoting *United States v. DeSalvo*, 41 F.3d 505, 514 (9th Cir. 1994)).

The district court ordered Ellis to pay restitution for losses beginning in 2008, even though the indictment stated that her scheme began "no later than in or about January 2012."  At oral argument, the Government insisted that this language included losses from 2008 because the indictment alleged only that Ellis's scheme began "*no later than in or about*" 2012, which meant the scheme possibly began years before 2012.  Taken literally, this language would include losses dating back to 2008.  It would also include losses dating back to the beginning of time.

Indictment language cannot be boundless.  Permitting indictments without temporal boundaries would authorize a permanent escape hatch for government drafters who otherwise "bear[] the burden" of making the language of an indictment "sufficient to cover all acts for which [they] will seek restitution."  *Id.* (citation omitted).  And it would prevent defendants from determining what facts may later prove relevant to their defense.  These concerns have led other circuits to prohibit the government from seeking restitution for losses occurring outside the dates identified in the indictment, even in cases where prosecutors tried to escape those limitations by using indefinite indictment language.  *See, e.g.*, *United States v. Alisuretove*, 788 F.3d 1247, 1258–59 (10th Cir. 2015) (vacating restitution award that included losses occurring

one month outside the dates identified in the indictment, though the indictment said the scheme occurred only "[i]n or about" those dates); *Akande*, 200 F.3d at 141–42 (same); *United States v. Hughey*, 147 F.3d 423, 438 (5th Cir. 1998) (vacating restitution award because some losses fell outside "the timeframe defined for the subject offense in the indictment," though the indictment stated the scheme occurred only "on or about" the dates specified); *see also United States v. White*, 883 F.3d 983, 992–93 (7th Cir. 2018) (finding plea agreement's "loose language," which suggested that the defendant's scheme began "no later than in or around the fall of 2009," did not warrant restitution for pre-2009 losses).

Ellis never raised this issue in the district court or on appeal, so it is not squarely before us. Going forward, however, courts awarding restitution should take care to consider "not only the objects of the [defendant's charged scheme], but also its temporal limits." *Alisuretove*, 788 F.3d at 1259.